IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA,

       Plaintiff

       v.                           Civil Action No.: 13-C-10

WISCONSIN PUBLIC SERVICE
CORPORATION,

       Defendant.

---

### AMENDED CONSENT DECREE

---

## TABLE OF CONTENTS

I. JURISDICTION AND VENUE……………………….………………………..  2

II. APPLICABILITY…………………………………….…………………….....  3

III. DEFINITIONS……………………………………………….……………………  4

IV. REQUIREMENT TO RETIRE, REFUEL OR REPOWER UNITS...................  14

V. NO$_x$ EMISSION REDUCTIONS AND CONTROLS..…………….……………  14

VI. SO$_2$ EMISSION REDUCTIONS AND CONTROLS……………….…….……..  19

VII. PM EMISSION REDUCTIONS AND CONTROLS………………….…….…....  23

VIII. PROHIBITION ON NETTING CREDITS OR OFFSETS………………..…….  29

IX. ENVIRONMENTAL MITIGATION PROJECTS………………………..….…  30

X. CIVIL PENALTY………………………………….………………………….  32

XI. RESOLUTION OF PAST CIVIL CLAIMS …………….………......................  33

XII. PERIODIC REPORTING………………………………………………..…….  34

XIII. REVIEW AND APPROVAL OF SUBMITTALS………………..….……..  36

XIV. STIPULATED PENALTIES……..…………………………………….…  37

XV. FORCE MAJEURE……………………………………………….……..  49

XVI. DISPUTE RESOLUTION…………………………………………………  52

XVII. PERMITS…………………………………………………………….…….  54

XVIII. INFORMATION COLLECTION AND RETENTION………………….…….  57

XIX. NOTICES…………………………………………………………….…….  58

XX. SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS…….  60

XXI. EFFECTIVE DATE………………………………………………..…..  62

i

XXII. RETENTION OF JURISDICTION……………………………….……………..…… 62

XXIII. MODIFICATION………………………………………………………………..…… 62

XXIV. GENERAL PROVISIONS………………………………………………….……..…. 63

XXV. SIGNATORIES AND SERVICE………………………………………….…..…… 66

XXVI. PUBLIC COMMENT/AGENCY REVIEW…………………………….…..…… 66

XXVII. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT

DECREE……………………………………………………………………….. 67

XXVIII. FINAL JUDGMENT………………………………………………………..….…… 68

APPENDIX A -- ENVIRONMENTAL MITIGATION PROJECTS

WHEREAS, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), is concurrently filing a Complaint and Consent Decree, for injunctive relief and civil penalties pursuant to Sections 113(b)(2) and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413(b)(2) and 7477, alleging that Wisconsin Public Service Corporation ("WPS") violated the Prevention of Significant Deterioration ("PSD") provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, requirements of Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally enforceable Wisconsin State Implementation Plan ("Wisconsin SIP");

WHEREAS, on November 18, 2009, EPA issued a Notice of Violation and Finding of Violation ("NOV/FOV") to WPS with respect to alleged violations of the CAA;

WHEREAS, the United States provided WPS and the State of Wisconsin with actual notice pertaining to WPS's alleged violations, in accordance with Section 113(a)(1) and (b) of the Act, 42 U.S.C. § 7413(a)(1) and (b);

WHEREAS, in the Complaint, the United States alleges, *inter alia,* that WPS made major modifications to major emitting facilities, and failed to obtain the necessary permits and install and operate the controls necessary under the Act to reduce sulfur dioxide ("$SO_2$"), oxides of nitrogen ("$NO_x$"), and/or particulate matter ("PM") at certain electricity generating stations located in Wisconsin, and that such emissions damage human health and the environment;

WHEREAS, in the Complaint, the United States alleges claims upon which relief can be granted against WPS under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477;

WHEREAS, the United States and WPS (collectively, the "Parties") have agreed that settlement of this action is in the best interests of the Parties and in the public interest, and that

1

entry of this Consent Decree without further litigation is the most appropriate means of resolving these matters;

WHEREAS, the Parties anticipate that the installation and operation of pollution control equipment and practices pursuant to this Consent Decree, and the retirement, refueling or repowering of certain facilities required by this Consent Decree, will achieve significant reductions of $SO_2$, $NO_x$, and PM emissions and improve air quality;

WHEREAS, the Parties have agreed, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length and that this Consent Decree is fair, reasonable, in the public interest, and consistent with the goals of the Act;

WHEREAS, WPS has cooperated in the resolution of these matters;

WHEREAS, WPS denies the violations alleged in the Complaint, and nothing herein shall constitute an admission of liability; and

WHEREAS, the Parties have consented to entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without any admission of fact or law, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and 1367, and pursuant to Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477. Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c). Solely for the purposes of this Consent Decree and the underlying Complaint, and for no other purpose, WPS waives all objections and defenses that it may have to the Court's jurisdiction over

2

this action, to the Court's jurisdiction over WPS, and to venue in this district. WPS consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. Except as expressly provided for herein, this Consent Decree shall not create any rights in or obligations of any party other than the Parties to this Consent Decree. Except as provided in Section XXVI (Public Comment/Agency Review) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice. Notwithstanding the foregoing, should this Consent Decree not be entered by this Court, then the waivers and consents set forth in this Section I (Jurisdiction and Venue) shall be null and void and of no effect.

## II. APPLICABILITY

2. Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the Parties, their successors and assigns, and upon WPS's directors, officers, employees, servants, and agents solely in their capacities as such.

3. WPS shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other company or other organization retained to perform work required by this Consent Decree. Notwithstanding any retention of contractors, subcontractors, or agents to perform work required under this Consent Decree, WPS shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree. In any action to enforce this Consent Decree, WPS shall not assert as a defense the failure of its officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless it is determined to be a Force Majeure Event in accordance with Section XV of this Consent Decree.

3

## III. DEFINITIONS

4.      Every term expressly defined by this Section shall have the meaning given that term herein. Every other term used in this Consent Decree that is also a term used under the Act or in a federal regulation implementing the Act, including regulations approved as part of the Wisconsin SIP, shall mean in this Consent Decree what such term means under the Act or those regulations.

5.      A "30-Day Rolling Average Emission Rate" for a Unit shall be determined by calculating an arithmetic average of all hourly emission rates in lb/mmBTU for the current Unit Operating Day and the previous 29 Unit Operating Days.  A new 30-Day Rolling Average Emission Rate shall be calculated for each new Unit Operating Day.  Each 30-Day Rolling Average Emission Rate shall include all emissions of the applicable pollutant that occur during all periods within any Unit Operating Day, including emissions from startup, shutdown, and Malfunction.

6.      A "12-Month Rolling Average Emission Rate" shall be determined by calculating an arithmetic average of all hourly emission rates in lb/mmBTU for the current Unit Operating Month and the previous 11 Unit Operating Months.  A new 12-Month Rolling Average Emission Rate shall be calculated for each new complete Unit Operating Month in accordance with the provisions of this Consent Decree.  Each 12-Month Rolling Average Emission Rate shall include all emissions that occur during all periods of operation, including startup, shutdown, and Malfunction.  For purposes of calculating a "12-Month Rolling Average Emission Rate," a "Unit Operating Month" means any month during which a Unit fires Fossil Fuel.

7.      "Baghouse" means a full stream (fabric filter or membrane) particulate emissions control device on the main boilers.

4

8.    "Business Day" means a day other than a Saturday, Sunday or Federal Holiday. In computing any period of time for submission of a notice or report required under this Consent Decree, where the last day would fall on a Saturday, Sunday or Federal Holiday, the period shall run until the next Business Day.

9.    "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving the monitoring of $NO_x$ and $SO_2$ emissions under this Consent Decree, the devices defined in 40 C.F.R. § 72.2 and installed and maintained as required by 40 C.F.R. Part 75.

10.    "Clean Air Act" or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

11.    "Consent Decree" means this Consent Decree and the Appendices hereto, which are incorporated into the Consent Decree.

12.    "Continuously Operate" or "Continuous Operation" means that when a pollution control technology or combustion control is required to be used at a Unit pursuant to this Consent Decree (including, but not limited to, SCR, DFGD, ReAct, ESP, Baghouse, or Low $NO_x$ Combustion System), it shall be operated at all times such Unit is in operation (except as otherwise provided by Section XV (Force Majeure)),  consistent with the technological limitations, manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)) for such equipment and the Unit.

13.    "Date of Entry" means the date this Consent Decree is approved or signed by the United States District Court Judge.

14.    "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Eastern District of Wisconsin.

5

15. "Day" means calendar day unless otherwise specified in this Consent Decree.

16. "Electrostatic Precipitator" or "ESP" means an air pollution control device for removing particulate matter from combustion gases by imparting an electric charge to the particles and then attracting them to a metal plate or screen of opposite charge before the combustion gases are exhausted to the atmosphere.

17. "Emission Rate" for a given pollutant means the number of pounds of that pollutant emitted per million British thermal units of heat input (lb/mmBTU), measured in accordance with this Consent Decree.

18. "Environmental Mitigation Projects" or "Projects" means the projects set forth in Section IX and Appendix A of this Consent Decree and any other project undertaken for purposes of fulfilling WPS' obligations under Section IX and approved for that purpose by the EPA pursuant to Section XIII (Review and Approval of Submittals).

19. "EPA" means the United States Environmental Protection Agency.

20. "Dry Flue Gas Desulfurization" or "Dry FGD" or "DFGD" means an add-on air pollution control system for the reduction of $SO_2$ located downstream of a boiler that sprays an alkaline sorbent slurry in one or more absorber vessels designed to provide intimate contact between an alkaline slurry and the flue gas stream to react with and remove acid gases such as $SO_2$ and HCl in the exhaust stream forming a dry powder material which is captured in a downstream particulate control device.

21. "Fossil Fuel" means any hydrocarbon fuel, including but not limited to coal, metallurgical coke, petroleum coke, petroleum oil, natural gas, or any other fuel made or derived from the foregoing.

6

22.     "Greenhouse Gases" means the air pollutant defined at 40 C.F.R § 86.1818-12(a) as of the Date of Lodging of this Consent Decree as the aggregate group of six greenhouse gases: carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. This definition continues to apply even if 40 C.F.R § 86.1818-12(a) is subsequently revised, stayed, vacated or otherwise modified.

23.     "lb/mmBTU" means one pound per million British thermal units.

24.     "Low $NO_x$ Combustion System" means burners and associated combustion air control equipment, including Overfire Air and Rich Reagent Injection (if installed at the Unit), which controls mixing characteristics of Fossil Fuels and oxygen, thus restraining the formation of $NO_x$ during combustion of fuels in the boiler.

25.     "Malfunction" means a failure to operate in a normal or usual manner by any air pollution control equipment, process equipment, or a process, which is sudden, infrequent, and not reasonably preventable. Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

26.     "Natural Gas" means natural gas received directly or indirectly through a connection to an interstate pipeline transporting natural gas governed by a tariff approved by the Federal Energy Regulatory Commission. The Parties recognize that Natural Gas is expected to contain no more than 0.5 grains of sulfur per 100 standard cubic feet of Natural Gas.

27.     "Netting" shall mean the process of determining whether a particular physical change or change in the method of operation of a major stationary source results in a "net emissions increase," as that term is defined at 40 C.F.R. § 52.21(b)(3)(i) and in the Wisconsin SIP.

28.     "$NO_x$" means oxides of nitrogen.

7

29. "NO$_x$ Allowance" means an authorization to emit a specified amount of NO$_x$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or applicable State Implementation Plan; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2011, a "NO$_x$ Allowance" shall include an allowance created and allocated to a WPS System Unit under such program only for control periods starting on or after the fourth anniversary of the Date of Entry of this Consent Decree.

30. "Nonattainment NSR" means the new source review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515 and 40 C.F.R. Part 51, and corresponding provisions of the federally enforceable Wisconsin SIP.

31. "Operational or Ownership Interest" means part or all of WPS's legal or equitable operational or ownership interest in any Unit ("Ownership Interest") or the right to be the operator (as that term is used and interpreted under the Act) of any Unit.

32. "Parties" means the United States of America on behalf of EPA and WPS. "Party" means one of the named "Parties."

33. "PM" means total filterable particulate matter, measured in accordance with the provisions of this Consent Decree.

34. "PM CEMS" or "PM Continuous Emission Monitoring System" means, for obligations involving the monitoring of PM emissions under this Consent Decree, the equipment that samples, analyzes, measures, and provides, by readings taken at frequent intervals, an electronic and/or paper record of PM emissions.

35. "PM Control Device" means any device, including an ESP or Baghouse, which reduces emissions of PM on the main boilers.

8

36. "PM Emission Rate" means the number of pounds of PM emitted per million BTU of heat input (lb/mmBTU).

37. "Plant-Wide Annual $NO_x$ Tonnage Cap" at Pulliam Units 5, 6, 7, and 8 means the sum of the tons of $NO_x$ emitted from Pulliam Units 5, 6, 7, and 8 including, without limitations, all tons of that pollutant emitted during periods of startup, shutdown, and Malfunction, in the designated year.

38. "Plant-Wide Annual $SO_2$ Tonnage Cap" at Pulliam Units 5, 6, 7, and 8 means the sum of the tons of $SO_2$ emitted from Pulliam Units 5, 6, 7, and 8 including, without limitations, all tons of that pollutant emitted during periods of startup, shutdown, and Malfunction, in the designated year

39. "Prevention of Significant Deterioration" or "PSD" means the new source review program within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492 and 40 C.F.R. Part 52, and corresponding provisions of the federally enforceable Wisconsin SIP.

40. "Project Dollars" means WPS's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section IX (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section IX and Appendix A of this Consent Decree, and (b) constitute WPS's direct payments for such projects, or WPS's external costs for contractors, vendors, and equipment.

41. "Pulliam" means WPS's Pulliam Generation Station consisting of four dry-bottom pulverized coal-fired boilers designated as Unit 5 (50 MW), Unit 6 (62.5 MW), Unit 7 (75 MW), and Unit 8 (125MW), which is located in Brown County, Wisconsin.

9

42. "ReACT" or "Regenerative Activated Coke Technology" means an integrated multipollutant control technology that removes $SO_2$, $NO_x$, and mercury from flue gas through a dry scrubbing adsorption process with activated coke. ReACT is a three stage regenerative process that includes: (a) an absorption stage where the exhaust flue gas comes in contact with a slow moving bed of activated coke pellets on a conveyor system and $SO_2$, $NO_x$ and mercury are absorbed when they come into contact with the pellets; (b) a regeneration stage where the activated coke pellets containing the $SO_2$, $NO_x$ and mercury are transferred to a thermal regenerator where reactions take place and the pollutants are released into a sulfur gas stream. This is done in the regenerator vessel by pre-heating, heating through natural-gas firing, and then cooling the pellets. The pellets are returned to the absorption stage. The absorbed mercury is then collected in the bottom of the vessel; and (c) a by-product recovery stage where the sulfur-rich gas containing the $SO_2$ and $NO_x$ flows to an adjacent acid recovery plant where a sulfuric acid is produced, stored and prepared for re-sale.

43. "Refuel" or "Refueled" means that a Unit is either Refueled to Natural Gas or Refueled to Another Non-Fossil Fuel Approved by EPA within the meaning of this Consent Decree.

44. "Refuel to Natural Gas" or "Refueled to Natural Gas" means, solely for purposes of this Consent Decree, the modification of a unit as necessary such that the modified unit generates electricity solely through the combustion of Natural Gas rather than coal, including installation of at least the following combustion controls to reduce emissions of $NO_x$: low-$NO_x$ natural gas burners and an overfire air system, as well as use of flue gas recirculation. Nothing herein shall prevent the reuse of any equipment at any existing unit or new emissions unit,

10

provided that WPS applies for, and obtains, all required permits, including, if applicable, a PSD or Nonattainment NSR permit.

45. "Refuel to Another Non-Fossil Fuel Approved by EPA" or "Refueled to Another Non-Fossil Fuel Approved by EPA" means, solely for purposes of this Consent Decree, the modification of a unit such that the modified unit generates electricity solely through the combustion of a non-fossil fuel approved by EPA pursuant to Section XIII (Review and Approval of Submittals). Nothing herein shall prevent the reuse of any equipment at any existing unit or new emissions unit, provided that WPS applies for, and obtains, all required permits, including, if applicable, a PSD or Nonattainment NSR permit.

46. "Repowers" or "Repowered" means, solely for purposes of this Consent Decree, the removal and replacement of the Unit components such that the replaced unit generates electricity solely through the combustion of Natural Gas rather than coal, through the use of a combined cycle combustion turbine technology.

47. "Retire" means to permanently shut down a Unit such that the Unit cannot physically or legally burn coal, and that WPS shall comply with applicable state and federal requirements for permanently ceasing operation of the Unit as a coal-fired electric generating Unit, including removing the Unit from Wisconsin's air emissions inventory, and amending all applicable permits so as to reflect the permanent shutdown status of such Unit. WPS can choose to not Retire and to continue to operate such a Unit if it is Refueled or Repowered within the meaning of this Consent Decree, and WPS obtains any and all required CAA permit(s) for the Refueled or Repowered Unit, including but not limited to an appropriate permit pursuant to CAA Subchapter I, Parts C and D, and pursuant to the applicable Wisconsin SIP provisions implementing CAA Subchapter I.

48. "Rich Reagent Injection" means a process of adding $NO_x$ reducing agents in a staged fuel rich region of the lower furnace to reduce the formation of $NO_x$.

49. "SCR" or "Selective Catalytic Reduction" means an air pollution control device for reducing $NO_x$ emissions in which ammonia ($NH_3$) is added to the flue gas and then passed through layers of a catalyst material. The ammonia and NOx in the flue gas stream react on the surface of the catalyst, forming nitrogen ($N_2$) and water vapor.

50. "$SO_2$" means sulfur dioxide.

51. "$SO_2$ Allowance" means an authorization to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or applicable State Implementation Plan; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2011, an "$SO_2$ Allowance" shall include an allowance created and allocated to a WPS System Unit under such program only for control periods starting on or after the fourth anniversary of the Date of Entry of this Consent Decree.

52. "State" means the State of Wisconsin.

53. "Super-Compliant Allowance" means a $NO_x$ Allowance or $SO_2$ Allowance attributable to reductions beyond the requirements of this Consent Decree, as described in Paragraphs 82 and 100.

54. "Surrender" or "Surrender of Allowances" means, for purposes of $SO_2$ or $NO_x$ Allowances, permanently surrendering allowances from the accounts administered by EPA and Wisconsin, so that such allowances can never be used thereafter to meet any compliance requirements under the Clean Air Act, a state implementation plan, or this Consent Decree.

12

55. "System" means collectively, solely for purposes of this Consent Decree, the Pulliam Generating Station and the Weston Generating Station.

56. "System-Wide Annual $NO_x$ Tonnage Limitation" means the limitations, as specified in this Consent Decree, on the number of tons of $NO_x$ that may be emitted from Pulliam Units 5, 6, 7, and 8 and Weston Units 1, 2, 3, and 4, collectively, during the relevant calendar year (i.e., January 1 through December 31), and shall include all emissions of $NO_x$ during all periods of operations, including startup, shutdown, and Malfunction.

57. "System-Wide Annual $SO_2$ Tonnage Limitation" means the limitations, as specified in this Consent Decree, on the number of tons of $SO_2$ that may be emitted from Pulliam Units 5, 6, 7, and 8 and Weston Units 1, 2, 3, and 4, collectively, during the relevant calendar year (i.e., January 1 through December 31), and shall include all emissions of $SO_2$ during all periods of operations, including startup, shutdown, and Malfunction.

58. "Title V Permit" means the permit required of WPS's major sources pursuant to Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

59. "Unit" means collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment and systems necessary for production of electricity. An electric steam generating station may be comprised of one or more Units.

60. "Unit Operating Day" means any Day on which a Unit fires Fossil Fuel.

61. "Weston" means WPS's Weston Generation Station consisting of four dry-bottom pulverized coal-fired boilers designated as Unit 1 (60 MW), Unit 2 (75 MW), Unit 3 (322 MW), and Unit 4 (535 MW), which is located in Marathon County, Wisconsin.

13

62.     "Wisconsin SIP" means the Wisconsin State Implementation Plan, and any amendments thereto, as approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

63.     "WPS" or "Defendant" means Wisconsin Public Service Corporation.

64.     "WPS System" means the Pulliam and Weston Generating Stations.

## IV.  REQUIREMENT TO RETIRE, REFUEL OR REPOWER UNITS

65.     By no later than June 1, 2015, WPS shall Retire, Refuel or Repower Pulliam Units 5 and 6 and Weston Units 1 and 2.  WPS shall apply for, and obtain, all required CAA permit(s) for any Refueled or Repowered unit, including but not limited to an appropriate permit pursuant to CAA Subchapter I, Parts C and D, and pursuant to the applicable Wisconsin SIP provisions implementing CAA Subchapter I.

## V.  NO$_x$ EMISSION REDUCTIONS AND CONTROLS

### A.  Operation and Performance NO$_x$ Requirements at Pulliam

66.     Commencing on December 31, 2012, and continuing thereafter, WPS shall Continuously Operate the existing Low NOx Combustion System on Pulliam Unit 7 and Unit 8 so that each Unit achieves and maintains a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.250 lb/mmBTU.

67.     For each calendar year as specified below, WPS shall not exceed the following Pulliam Plant-Wide Annual NO$_x$ Tonnage Limitations:

| For the Calendar Year Specified Below: | Plant-Wide Annual NO$_x$ Tonnage Limitation: |
|---|---|
| January 1, 2013 to December 31, 2013 | 2,700 |
| January 1, 2014 to December 31, 2014 | 2,400 |
| January 1, 2015 to December 31, 2015 | 2,000 |
| January 1, 2016 to December 31, 2016 and continuing each calendar year thereafter | 1,500 |

14

### B. Installation, Operation and Performance NO$_x$ Requirements at Weston

68.    Commencing no later than December 31, 2012, and continuing until Weston Unit 1 is Retired, Refueled or Repowered pursuant to Paragraph 65, WPS shall Continuously Operate the existing Low NO$_x$ Combustion System at Weston Unit 1 so that it achieves and maintains a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.250 lb/mmBTU.

69.    Commencing on December 31, 2012, and continuing until Weston Unit 2 is Retired, Refueled or Repowered pursuant to Paragraph 65, WPS shall Continuously Operate the existing Low NO$_x$ Combustion System at Weston Unit 2 so that it achieves and maintains a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.280 lb/mmBTU.

70.    Commencing on December 31, 2012, and continuing through December 30, 2013, WPS shall Continuously Operate the existing Low NOx Combustion System at Weston Unit 3 so that it achieves and maintains a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.140 lb/mmBTU.

71.    Commencing on December 31, 2013, and continuing through December 30, 2016, WPS shall Continuously Operate the existing Low NO$_x$ Combustion System at Weston Unit 3 so that it achieves and maintains a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.130 lb/mmBTU.

72.    WPS shall install ReACT at Weston Unit 3 and, commencing on December 31, 2016, and continuing thereafter, WPS shall Continuously Operate such ReACT so that it achieves and maintains a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.100 lb/mmBTU.  Alternatively, with prior written request to EPA and written approval from EPA, WPS may install an alternative equivalent pollution control technology approved by EPA pursuant to Section XIII of this Consent Decree and, commencing on December 31, 2016 and

15

continuing thereafter, Continuously Operate such alternative technology such that it achieves and maintains the 30-Day Rolling Average NOx Emission Rate specified in this Paragraph.

73.     Commencing no later than 30 Days after the Date of Entry of the Consent Decree, and continuing thereafter, WPS shall Continuously Operate the existing SCR at Weston Unit 4 so that it achieves and maintains a 30-Day Rolling Average $NO_x$ Emission Rate of no greater than 0.060 lb/mmBTU.

## C.  <u>System-Wide Annual NO$_x$ Tonnage Limitations</u>

74.     For each calendar year as specified below, WPS shall not exceed the following System-Wide Annual $NO_x$ Tonnage Limitations:

| For the Calendar Year Specified Below: | System-Wide Annual NO$_x$ Tonnage Limitation: |
|---|---|
| January 1, 2013 to December 31, 2013 | 6,400 |
| January 1, 2014 to December 31, 2014 | 6,100 |
| January 1, 2015 to December 31, 2015 | 4,900 |
| January 1, 2016 to December 31, 2016 | 3,900 |
| January 1, 2017 to December 31, 2017 and continuing each calendar year thereafter | 3,700 |

## D.  <u>Monitoring of NO$_x$ Emissions</u>

75.     In determining a 30-Day Rolling Average $NO_x$ Emission Rate, WPS shall use CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that $NO_x$ emissions data need not be bias adjusted and the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply to such determinations.

76.     For purposes of determining compliance with the Pulliam Plant-Wide Annual $NO_x$ Tonnage Limitations and System-Wide Annual $NO_x$ Tonnage Limitations, WPS shall use

16

$NO_x$ emission data obtained from a CEMS in accordance with the procedures specified in 40 C.F.R. Part 75.

### E. Use and Surrender of $NO_x$ Allowances

77. Except as may be necessary to comply with Section XIV (Stipulated Penalties), WPS shall not use $NO_x$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required by this Consent Decree by using, tendering, or otherwise applying $NO_x$ Allowances to offset any excess emissions.

78. Except as provided in this Consent Decree, beginning in calendar year 2013 and continuing each calendar year thereafter, WPS shall not sell, bank, trade, or transfer any $NO_x$ Allowances allocated to the WPS System.

79. Beginning in calendar year 2013, and continuing each calendar year thereafter, WPS shall Surrender all $NO_x$ Allowances allocated to the WPS System for that calendar year that WPS does not need to meet its own federal and/or state Clean Air Act regulatory requirements for: (a) the WPS System Units or (b) any electricity generating unit in the State of Wisconsin in which WPS has an Operational or Ownership Interest that is subject to a federal consent decree addressing PSD and/or Nonattainment NSR violations to which the United States is a party.

80. Nothing in this Consent Decree shall prevent WPS from purchasing or otherwise obtaining $NO_x$ Allowances from another source for purposes of complying with federal and/or state Clean Air Act regulatory requirements to the extent otherwise allowed by law.

81. The requirements of this Consent Decree pertaining to WPS's use and Surrender of $NO_x$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree.

17

### F. Super-Compliant NO$_x$ Allowances

82. Notwithstanding Paragraphs 78 and 79, in each calendar year beginning in 2013, and continuing thereafter, WPS may sell, bank, use, trade, or transfer NO$_x$ Allowances allocated to the WPS System that are made available in that calendar year solely as a result of:

    a. the installation and operation of any NO$_x$ pollution control that is not otherwise required under this Consent Decree, and is not otherwise required by law;

    b. the use of ReACT prior to the date established by this Consent Decree; or

    c. achievement and maintenance of an Emission Rate below an applicable 30-Day Rolling Average NO$_x$ Emission Rate,

provided that WPS is also in compliance for that calendar year with all emission limitations for NO$_x$ set forth in this Consent Decree. WPS shall timely report the generation of such Super-Compliant Allowances in accordance with Section XII (Periodic Reporting) of this Consent Decree.

### G. Method for Surrender of NO$_x$ Allowances

83. WPS shall Surrender, or transfer to a non-profit third-party selected by WPS for Surrender, all NO$_x$ Allowances required to be Surrendered pursuant to Paragraph 79 by June 30 of the immediately following calendar year.

84. For all NO$_x$ Allowances required to be Surrendered, WPS shall first submit a NO$_x$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such NO$_x$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing. Such NO$_x$ Allowance transfer requests may be made in an electronic manner using the EPA's Clean Air Markets Division Business System or similar system provided by EPA. As part of submitting these

18

transfer requests, WPS shall irrevocably authorize the transfer of these $NO_x$ Allowances and identify – by name of account and any applicable serial or other identification numbers or station names – the source and location of the $NO_x$ Allowances being Surrendered.

## VI.  $SO_2$ EMISSION REDUCTIONS AND CONTROLS

### A.  Operation and Performance $SO_2$ Requirements at Pulliam

85.  Commencing on January 1, 2013, and continuing until Pulliam Unit 5 and Unit 6 are Retired, Refueled or Repowered pursuant to Paragraph 65, WPS shall achieve and maintain at each Pulliam Unit 5 and Unit 6 a 12-Month Rolling Average $SO_2$ Emission Rate of no greater than 0.750 lb/mmBTU.

86.  Commencing on January 1, 2013, and continuing thereafter, WPS shall achieve and maintain at each Pulliam Unit 7 and Unit 8 a 12-Month Rolling Average $SO_2$ Emission Rate of no greater than 0.750 lb/mmBTU.

87.  For each calendar year as specified below, WPS shall not exceed the following Pulliam Plant-Wide Annual $SO_2$ Tonnage Limitations:

| For the Calendar Year Specified Below: | Plant-Wide Annual $SO_2$ Tonnage Limitation: |
|---|---|
| For each calendar year from January 1, 2013 to December 31, 2014 | 5,600 |
| January 1, 2015 to December 31, 2015 | 3,200 |
| January 1, 2016 to December 31, 2016 and continuing each calendar year thereafter | 2,100 |

### B.  Installation, Operation and Performance $SO_2$ Requirements at Weston

88.  Commencing on January 1, 2013, and continuing until Weston Unit 1 and Unit 2 are Retired, Refueled or Repowered pursuant to Paragraph 65, WPS shall operate Weston Unit 1

19

and Weston Unit 2 so that each Unit achieves and maintains a 12-Month Rolling Average $SO_2$ Emission Rate of no greater than 0.750 lb/mmBTU.

89.     Commencing on January 1, 2013, and continuing through December 30, 2016, WPS shall Continuously Operate Weston Unit 3 so that it achieves and maintains a 12-Month Rolling Average Emission Rate for $SO_2$ of no greater than 0.750 lb/mmBTU.

90.     WPS shall install ReACT at Weston Unit 3 and, commencing on December 31, 2016, and continuing thereafter, WPS shall Continuously Operate such ReACT so that it achieves and maintains a 30-Day Rolling Average $SO_2$ Emission Rate of no greater than 0.080 lb/mmBTU.  Alternatively, with prior written request to EPA and written approval from EPA, WPS may install an alternative equivalent pollution control technology approved by EPA pursuant to Section XIII of this Consent Decree and, commencing on December 31, 2016 and continuing thereafter, Continuously Operate such alternative technology such that it achieves and maintains the 30-Day Rolling Average $SO_2$ Emission Rate specified in this Paragraph.

91.     Commencing no later than 30 Days after the Date of Entry of the Consent Decree, and continuing thereafter, WPS shall burn only Powder River Basin Coal at Weston 4 and Continuously Operate the existing DFGD at Weston Unit 4 so that it achieves and maintains a 30-Day Rolling Average $SO_2$ Emission Rate of no greater than 0.080 lb/mmBTU.

   **C.  System-Wide Annual $SO_2$ Tonnage Limitation**.

92.     For each calendar year as specified below, WPS shall not exceed the following System-Wide Annual $SO_2$ Tonnage Limitations:

| For the Calendar Year Specified Below: | System-Wide Annual $SO_2$ Tonnage Limitation: |
| --- | --- |
| For each calendar year from January 1, 2013 to December 31, 2014 | 16,500 |
| January 1, 2015 to December 31, 2015 | 12,300 |

20

| January 1, 2016 to December 31, 2016 | 10,200 |
|---|---|
| January 1, 2017 to December 31, 2017 and continuing each calendar year thereafter | 4,250 |

### D. Monitoring of $SO_2$ Emissions

93.     In determining a 30-Day Rolling Average $SO_2$ Emission Rate and 12-Month Rolling Average $SO_2$ Emission Rate, WPS shall use CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that $SO_2$ emissions data need not be bias adjusted and the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply to such determinations.  Diluent capping (i.e., 5% $CO_2$) will be applied to the $SO_2$ emission rate for any hours where the measured $CO_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1.

94.     For purposes of determining compliance with any Pulliam Plant-Wide Annual $SO_2$ Tonnage Limitation and System-Wide Annual $SO_2$ Tonnage Limitation, WPS shall use $SO_2$ emission data obtained from a CEMS in accordance with the procedures specified in 40 C.F.R. Part 75. Diluent capping (i.e., 5% $CO_2$) will be applied to the $SO_2$ emission rate for any hours where the measured $CO_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1.

### E. Use and Surrender of $SO_2$ Allowances

95.     Except as may be necessary to comply with Section XIV (Stipulated Penalties), WPS shall not use $SO_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required by this Consent Decree by using, tendering, or otherwise applying $SO_2$ Allowances to offset any excess emissions.

21

96. Except as provided in this Consent Decree, beginning in calendar year 2013 and continuing each calendar year thereafter, WPS shall not sell, bank, trade, or transfer any $SO_2$ Allowances allocated to the WPS System.

97. Beginning in calendar year 2013, and continuing each calendar year thereafter, WPS shall Surrender all $SO_2$ Allowances allocated to the WPS System for that calendar year that WPS does not need to meet its own federal and/or state Clean Air Act regulatory requirements for: (a) the WPS System Units or (b) any electricity generating unit in the State of Wisconsin in which WPS has an Operational or Ownership Interest, that is subject to a federal consent decree addressing PSD and/or Nonattainment NSR violations to which the United States is a party.

98. Nothing in this Consent Decree shall prevent WPS from purchasing or otherwise obtaining $SO_2$ Allowances from another source for purposes of complying with federal and/or state Clean Air Act regulatory requirements to the extent otherwise allowed by law.

99. The requirements of this Consent Decree pertaining to WPS's use and Surrender of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree.

**F. Super-Compliant $SO_2$ Allowances**

100. Notwithstanding Paragraphs 96 and 97, in each calendar year beginning in 2013, and continuing thereafter, WPS may sell, bank, use, trade, or transfer $SO_2$ Allowances made available in that calendar year solely as a result of:

a. the installation and operation of any $SO_2$ pollution control that is not otherwise required under this Consent Decree, and is not otherwise required by law;

b. the use of ReACT prior to the date established by this Consent Decree; or

22

c. achievement and maintenance of an Emission Rate below an applicable 30-Day Rolling Average $SO_2$ Emission Rate or 12-Month Rolling Average $SO_2$ Emission Rate,

provided that WPS is also in compliance for that calendar year with all emission limitations for $SO_2$ set forth in this Consent Decree. WPS shall timely report the generation of such Super-Compliant Allowances in accordance with Section XII (Periodic Reporting) of this Consent Decree.

### G. Method for Surrender of $SO_2$ Allowances.

101. WPS shall Surrender, or transfer to a non-profit third party selected by WPS for Surrender, all $SO_2$ Allowances required to be Surrendered pursuant to Paragraph 97 by June 30 of the immediately following calendar year.

102. For all $SO_2$ Allowances required to be Surrendered, WPS shall first submit an $SO_2$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such $SO_2$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing. As part of submitting these transfer requests, WPS shall irrevocably authorize the transfer of these $SO_2$ Allowances and identify – by name of account and any applicable serial or other identification numbers or station names – the source and location of the $SO_2$ Allowances being Surrendered.

### VII. PM EMISSION REDUCTIONS AND CONTROLS

### A. Optimization of Baghouses and ESPs

103. By no later than 90 Days from the Date of Entry of this Consent Decree, and continuing thereafter, WPS shall Continuously Operate each existing PM Control Device on each Unit in the WPS System to maximize PM emission reductions at all times when the Unit is

23

in operation. Except as required during correlation testing under 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Quality Assurance Requirements under Appendix F, Procedure 2, as required by this Consent Decree, WPS shall, at a minimum, ensure that to the extent practicable: (a) each section of each ESP at such Unit is fully energized and each compartment of each Baghouse at such Unit remains operational; (b) the automatic control systems on each ESP at such Unit are operated to maximize PM collection efficiency, where applicable; (c) each opening in the casings, ductwork, and expansion joints for each ESP and each Baghouse at such Unit is inspected and repaired during the next planned Unit outage (or unplanned outage of sufficient length) to minimize air leakage; (d) the power levels delivered to each ESP at such Unit are maintained, where applicable, consistent with manufacturers' specifications, the operational design of the Unit, and good engineering practices; (e) the plate-cleaning and discharge-electrode-cleaning systems for each ESP at such Unit are optimized, where applicable, by varying the cycle time, cycle frequency, rapper-vibrator intensity, and number of strikes per cleaning event; and (f) for each such Unit with one or more Baghouses, a bag leak detection program is developed and implemented to ensure that leaking bags are promptly replaced. In lieu of the foregoing obligation to Continuously Operate each existing PM Control Device, existing WPS System Units that are Repowered or Refueled to Natural Gas will instead meet a PM Emission Rate of no greater than 0.010 lbs/mmBTU. Compliance with this limitation will be based on a one-time performance stack test which will be completed either within 180 days of entry of the Modification Order or the completion of a project to Repower or Refuel a Unit to Natural Gas, whichever occurs later.

24

**B. Operation and Performance Requirements for PM Controls at Pulliam and Weston**

104.     Where stack testing is used pursuant to Paragraph 106, commencing on December 31, 2012, and continuing thereafter, WPS shall Continuously Operate the existing ESP at each Pulliam Unit 7 and Unit 8 so that it achieves and maintains a filterable PM Emission Rate of no greater than 0.030 lb/mmBTU, based on a rolling 3-hour average.

105.     Where stack testing is used pursuant to Paragraph 106, commencing on December 31, 2012, and continuing thereafter, WPS shall Continuously Operate the existing Baghouse at each Weston Unit 3 and Unit 4 so that it achieves and maintains a filterable PM Emission Rate of no greater than 0.0150 lb/mmBTU, based on a rolling 3-hour average.

**C. Annual PM Stack Tests**

106.     Commencing in calendar year 2014, and continuing annually thereafter, WPS shall ensure that a stack test for PM is conducted on each Unit in the WPS System every four operating quarters pursuant to Paragraphs 107 and 108 unless the Unit is Retired, Refueled, or Repowered to Natural Gas by December 31 of the prior calendar year, at which point this requirement shall no longer apply.  An "operating quarter," for purposes of this Paragraph, is any calendar quarter during which a Unit operates 168 hours or more.  If testing is unable to be completed in the fourth operating quarter due to unforeseen circumstances, it shall be completed within 720 Unit Operating Hours if the Unit returns to service.  Alternatively, following the installation and operation of PM CEMS as required by Section VII.D of this Consent Decree, WPS may seek approval pursuant to Section XIII of this Consent Decree to forego stack testing and instead demonstrate continuous compliance with an applicable filterable PM Emission Rate using CEMS on a 3-hour rolling average basis.

25

107. To determine compliance with the filterable PM Emission Rate established in Paragraphs 104 and 105, WPS shall use EPA Method 5 (filterable portion only), unless EPA approves a request to demonstrate continuous compliance with a filterable PM Emission Rate using PM CEMS under the preceding Paragraph 106. Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction. The sampling time for each run shall be at least 60 minutes and the volume of each run shall be at least 0.85 dry standard cubic meters (30 dry standard cubic feet). WPS shall calculate the PM Emission Rate from the stack test results in accordance with 40 C.F.R. § 60.8(f). The results of each PM stack test shall be submitted to EPA and the applicable State agency within 60 Days of completion of each test.

108. Commencing in calendar year 2013, and continuing annually thereafter, WPS shall also conduct a PM stack test for condensable PM on each Unit in the WPS System using the reference methods and procedures set forth at 40 C.F.R. Part 51, Appendix M, Method 202, unless the Unit is Retired, Refueled or Repowered by December 31 of the prior calendar year. Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction. The sampling time for each run shall be at least 60 minutes and the volume of each run shall be at least 0.85 dry standard cubic meters (30 dry standard cubic feet). WPS shall calculate the number of pounds of condensable PM emitted per million BTU of heat input (lb/mmBTU) from the stack test results in accordance with 40 C.F.R. § 60.8(f). The results of the PM stack test conducted pursuant to this Paragraph shall not be used for the purpose of determining compliance with the PM Emission Rates required by this Consent Decree. The results of each PM stack test shall be submitted to EPA and the Wisconsin Department of Natural Resources within 60 Days of completion of each test.

26

If EPA approves a request to demonstrate continuous compliance with an applicable PM Emission Rate at a Unit using PM CEMS under Paragraph 106, annual stack testing for condensable PM using the reference methods and procedures set forth at 40 C.F.R. Part 51, Appendix M, Method 202 is not required for that Unit.

109. When WPS submits the application for amendment to its Title V Permit pursuant to Paragraph 179, that application shall include a Compliance Assurance Monitoring ("CAM") plan, under 40 C.F.R. Part 64, for the PM Emission Rate in Paragraphs 104 and 105. The PM CEMS required under Paragraph 110 may be used in that CAM plan.

### D. PM Continuous Emission Monitoring Systems

110. By no later than December 31, 2013, WPS shall install, correlate, maintain, and operate PM CEMS on one of either Weston Units 3 or 4. By no later than December 31, 2014, WPS shall install, correlate, maintain, and operate a PM CEMS on the other Weston Unit 3 or 4. The PM CEMS shall comprise a continuous particle mass monitor measuring filterable particulate matter concentration, directly or indirectly, on an hourly average basis and a diluent monitor used to convert the concentration to units expressed in lb/mmBTU. The PM CEMS installed at each Unit must be appropriate for the anticipated stack conditions and capable of measuring filterable PM concentrations on an hourly average basis. WPS shall maintain, in an electronic database, the hourly average emission values of all PM CEMS in lb/mmBTU. Except for periods of monitor malfunction, maintenance, or repair, WPS shall continuously operate the PM CEMS at all times when the Unit it serves is operating.

111. By no later than July 1, 2013, WPS shall submit to EPA for review and approval pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree a plan for the installation and correlation of the PM CEMS for Weston Unit 3 and Weston Unit 4.

27

112.     By no later than December 31, 2013, WPS shall submit to EPA for review and approval pursuant to Section XIII (Review and Approval of Submittals) of this Consent Decree a proposed Quality Assurance/Quality Control ("QA/QC") protocol that shall be followed for such PM CEMS.

113.     In developing both the plan for installation and correlation of the PM CEMS and the QA/QC protocol, WPS shall use the criteria set forth in 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and 40 C.F.R. Part 60 Appendix F, Procedure 2.  Following EPA's approval of the plan described in Paragraph 111 and the QA/QC protocol described in Paragraph 112, WPS shall thereafter operate the PM CEMS in accordance with the approved plan and QA/QC protocol.

114.     WPS shall install, correlate, maintain, and continuously operate the PM CEMS, conduct performance specification tests on the PM CEMS, and demonstrate compliance with the PM CEMS installation and correlation plans submitted to and approved by EPA in accordance with Paragraphs 111 and 112.  Notwithstanding the Emission Rate requirement in Paragraph 105, WPS may achieve a filterable PM Emission Rate of no greater than 0.030 lb/mmBTU during periods of level 3 (high range) correlation testing under PS-11, Section 8.6(4), provided that WPS conducts such correlation testing in accordance with the procedures approved by EPA as part of the certification plan required by Paragraph 111.  WPS shall report, pursuant to Section XII (Periodic Reporting), the data recorded by the PM CEMS identified in Paragraphs 110 in excess of the applicable PM Emission Rate and any concentrations measured by the PM CEMS that are greater than 125% of the highest PM concentration level used in the most recent correlation testing performed pursuant to Performance Specification 11 in 40 C.F.R. Part 60,

28

Appendix B. The data shall be reported in lb/mmBTU on a rolling average 3-hour basis in electronic format to EPA.

115. For purposes of determining compliance with this Consent Decree, stack testing using EPA Method 5 (filterable only) shall be the compliance method for the PM Emission Rates established by this Consent Decree, unless EPA approves a request under Paragraph 106, in which case PM CEMS shall be used to demonstrate continuous compliance with an applicable PM Emission Rate on a 3-hour rolling average basis. Data from PM CEMS shall be used, at a minimum, to monitor emissions on a continuous basis.

116. Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8314 (Feb. 24, 1997)) concerning the use of data for any purpose under the Act.

## VIII. PROHIBITION ON NETTING CREDITS OR OFFSETS

117. Emission reductions at the WPS System that result from actions to be taken by WPS after the Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a Netting credit or offset under the Clean Air Act's Nonattainment NSR and PSD programs. Notwithstanding the preceding sentence, WPS may use any creditable contemporaneous emission decreases of GHGs resulting from the shutdown of Weston Unit 1 for the purpose of demonstrating whether the construction of ReACT at Weston Unit 3 as required by this Consent Decree would result in a significant net emissions increase under the Clean Air Act's NSR program, provided that (a) such emission reductions are determined by the applicable permitting authority to be otherwise creditable and contemporaneous under the applicable SIP

29

and WPS complies with, and is subject to, all requirements and criteria for creating contemporaneous creditable decreases as set forth in 40 C.F.R. § 52.21(b) and the Wisconsin SIP, and (b) WPS is in full compliance with all other provisions of this Consent Decree.

118. The limitations on the generation and use of Netting credits and offsets set forth in the previous Paragraph do not apply to emission reductions achieved by a particular WPS System Unit that are greater than those required under this Consent Decree for that particular WPS System Unit. For purposes of this Paragraph, emission reductions from a WPS System Unit are greater than those required under this Consent Decree if they result from such Unit's compliance with federally-enforceable emission limits that are more stringent than those limits imposed on the Unit under this Consent Decree and under applicable provisions of the Clean Air Act or the Wisconsin SIP.

119. Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the applicable state regulatory agency or EPA for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## IX.  ENVIRONMENTAL MITIGATION PROJECTS

120. WPS shall implement the Environmental Mitigation Projects ("Projects") described in Appendix A to this Consent Decree in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree. In implementing the Projects, WPS shall spend no less than $6,000,000 in Project Dollars. WPS shall not include its own personnel costs in overseeing the implementation of the Projects as Project Dollars.

30

121. The projects to be performed pursuant to this Section shall be for the purpose of beneficially restoring and/or mitigating the environments that EPA alleges were damaged by the operation of the WPS Units, including environments allegedly damaged within the WPS service territory.

122. WPS shall maintain, and present to EPA upon request, all documents to substantiate the Project Dollars expended to implement the Projects described in Appendix A, and shall provide these documents to EPA within 30 Days of a request for the documents.

123. All plans and reports prepared by WPS pursuant to the requirements of this Section IX of the Consent Decree and required to be submitted to EPA shall be publicly available from WPS without charge.

124. WPS shall certify, as part of each plan submitted to EPA for any Project, that WPS is not otherwise required by law to perform the Project described in the plan, that WPS is unaware of any other person who is required by law to perform the Project, and that WPS will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law, including but not limited to any applicable renewable or energy efficiency portfolio standards.

125. WPS shall use good faith efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

126. If WPS elects (where such an election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of WPS, but not including WPS's agents or contractors, that person or instrumentality must, in writing: (a) identify its legal authority for accepting such funding; and (b) identify its legal authority to

31

conduct the Project for which WPS contributes the funds. Regardless of whether WPS elects (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, WPS acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if WPS demonstrates that the funds have been actually spent by either WPS or by the person or instrumentality receiving them, and that such expenditures met all requirements of this Consent Decree.

127.    WPS shall comply with the reporting requirements described in Appendix A.

128.    Within 90 Days following the completion of each Project required under this Consent Decree (including any applicable periods of demonstration or testing), WPS shall submit to the United States a report that documents the date that the Project was completed, WPS's results of implementing the Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by WPS in implementing the Project.

## X. CIVIL PENALTY

129.    Within 30 Days after the Date of Entry of this Consent Decree, WPS shall pay to the United States a civil penalty in the amount of $1,200,000. The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2012V01800 and DOJ Case Number 90-5-2-1-1230/1 and the civil action case name and case number assigned to the United States' enforcement action in this case. The costs of such EFT shall be WPS's responsibility. Payment shall be made in accordance with instructions provided to WPS by the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern District of Wisconsin. Any funds received after 2:00 p.m. EDT shall be credited on the next business day. At the time of payment,

WPS shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XIX (Notices) of this Consent Decree.

130.     Failure to timely pay the civil penalty shall subject WPS to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render WPS liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

131.     Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## XI.  RESOLUTION OF PAST CIVIL CLAIMS

132.     <u>Claims of the United States Based on Modifications Occurring Before the Date of Lodging of this Consent Decree</u>.  Entry of this Consent Decree shall resolve all civil claims of the United States against WPS that arose from any modifications commenced at Pulliam Units 5, 6, 7, and 8 and Weston Units 1, 2, 3, and 4  prior to the Date of Lodging of this Consent Decree, including but not limited to those modifications alleged in the Complaint in this civil action and in the NOV issued to WPS on November 18, 2009, under any or all of:  (a) Part C or D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing PSD and Nonattainment NSR provisions of the Wisconsin SIP; (b) Section 111 of the Act, 42 U.S.C. § 7411, and 40 C.F.R. § 60.14; and (c) Title V of the Act, 42 U.S.C. § 7661-7661f, but only to the extent that such Title V claims are based on WPS's failure to obtain an operating permit that reflects applicable requirements imposed under Part C or D of Subchapter I of the Clean Air Act.

33

## XII. PERIODIC REPORTING

133. After entry of this Consent Decree, WPS shall submit to the United States a periodic report, within 60 Days after the end of each half of the calendar year (January through June and July through December). The report shall include the following information:

    a. all information necessary to determine compliance with the requirements of the following provisions of this Consent Decree: all applicable 30-Day Rolling Average $NO_x$ Emission Rates and 30-Day Rolling Average $SO_2$ Emission Rates; all applicable 12-Month Rolling Average $SO_2$ Emission Rates; all applicable PM Emission Rates; all applicable Pulliam Plant-Wide Annual $NO_x$ Tonnage Limitations and Pulliam Plant-Wide Annual $SO_2$ Tonnage Limitations; all applicable System-Wide Annual $NO_x$ Tonnage Limitations and System-Wide Annual $SO_2$ Tonnage Limitations; the obligation to monitor $NO_x$, $SO_2$, and PM emissions; the obligation to optimize PM emission controls; and the obligation to Surrender $NO_x$ Allowances and $SO_2$ Allowances;

    b. 3-hour rolling average PM CEMS data as required by Paragraph 114, identifying all periods in excess of 0.030 lb/mmBTU or 0.015 lb/mmBTU, as appropriate, and all periods of monitor malfunction, maintenance, and/or repair as provided in Paragraph 110;

    c. emission reporting and Allowance accounting information necessary to determine Super-Compliant $NO_x$ and $SO_2$ Allowances that WPS claims to have generated in accordance with Sections V ($NO_x$ Emission Reductions and Controls) and VI ($SO_2$ Emission Reductions and Controls) through control of emissions beyond the requirements of this Consent Decree;

34

d.  schedule for the installation or upgrade and commencement of operation of new or upgraded pollution control devices required by this Consent Decree, including the nature and cause of any actual or anticipated delays, and any steps taken by WPS to mitigate such delay;

e.  all affirmative defenses asserted pursuant to Paragraphs 149 through 157 during the period covered by the progress report;

f.  an identification of all periods when any pollution control device required by this Consent Decree to Continuously Operate was not operating, the reason(s) for the equipment not operating, and the basis for WPS's compliance or non-compliance with the Continuous Operation requirements of this Consent Decree; and

g.  a summary of actions implemented and expenditures (cumulative and in the current reporting period) made pursuant to implementation of the Environmental Mitigation Projects required pursuant to Section IX.

134.   In any periodic report submitted pursuant to this Section, WPS may incorporate by reference information previously submitted under its Title V permitting requirements, provided that WPS attaches the Title V Permit report (or the pertinent portions of such report) and provides a specific reference to the provisions of the Title V Permit report that are responsive to the information required in the periodic report.

135.   In addition to the reports required pursuant to this Section, if WPS violates or deviates from any provision of this Consent Decree, WPS shall submit to EPA a report on the violation or deviation within 15 Days after WPS knew or should have known of the event.  In the report, WPS shall explain the cause or causes of the violation or deviation and any measures taken or to be taken by WPS to cure the reported violation or deviation or to prevent such

35

violation or deviations in the future. If at any time, the provisions of this Consent Decree are included in Title V Permits, consistent with the requirements for such inclusion in this Consent Decree, then the deviation reports required under applicable Title V regulations shall be deemed to satisfy all the requirements of this Paragraph.

136.    Each WPS report required by this Consent Decree shall be signed by the Responsible Official as defined in Title V of the Clean Air Act for Pulliam and Weston, or his or her equivalent or designee of at least the rank of Vice President or General Counsel as appropriate, and shall contain the following certification:

> *This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.*

## XIII.  REVIEW AND APPROVAL OF SUBMITTALS

137.    WPS shall submit each plan, report, or other submission required by this Consent Decree to the EPA whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree. EPA may approve the submittal or decline to approve it and provide written comments explaining the bases for declining such approval as soon as reasonably practicable. Within 60 Days of receiving written comments from EPA, WPS shall either: (a) revise the submittal consistent with the written comments and provide the revised submittal to EPA; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XVI (Dispute Resolution) of this Consent Decree.

138.    Upon receipt of EPA's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, WPS shall implement the approved submittal in accordance with the schedule specified therein or another EPA-approved schedule.

## XIV. STIPULATED PENALTIES

139.    For any failure by WPS to comply with the terms of this Consent Decree, and subject to the provisions of Sections XV (Force Majeure) and XVI (Dispute Resolution), WPS shall pay, within 30 Days after receipt of written demand to WPS by the United States, the following stipulated penalties to the United States:

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a.  Failure to pay the civil penalty as specified in Section X (Civil Penalty) of this Consent Decree | $10,000 per Day |
| b.  Failure to comply with any applicable 30-Day Rolling Average $NO_x$ Emission Rate or 30-Day Rolling Average $SO_2$ Emission Rate | $2,500 per Day per violation where the violation is less than 5% in excess of the lb/mmBTU limits<br><br>$5,000 per Day per violation where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limits<br><br>$10,000 per Day per violation where the violation is equal to or greater than 10% in excess of the lb/mmBTU limits |
| c. Failure to comply with any applicable 12-Month Rolling Average $SO_2$ Emission Rate, where the violation is less than 5% in excess of the limits set forth in this Consent Decree. | $200 per day per violation |
| d. Failure to comply with any applicable 12-Month Rolling Average $SO_2$ Emission Rate, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree. | $400 per day per violation |

| | |
|---|---|
| e. Failure to comply with any applicable 12-Month Rolling Average $SO_2$ Emission Rate, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree. | $800 per day per violation |
| f.  Failure to comply with the applicable System-Wide Annual $NO_x$ Tonnage Limitations established by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) at WPS's option, either the Surrender of $NO_x$ allowances in an amount equal to two times the number of tons of $NO_x$ emitted that exceeded the System-Wide Annual $NO_x$ Tonnage Limitation, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $NO_x$ emitted that exceeded the System-Wide Annual $NO_x$ Tonnage Limitation |
| g. Failure to comply with the applicable Plant-Wide Annual $NO_x$ Tonnage Limitation for established for Pulliam by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) at WPS's option, either the Surrender of $NO_x$ Allowances in an amount equal to two times the number of tons of $NO_x$ emitted that exceeded the Plant-Wide Annual $NO_x$ Tonnage Limitation, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $NO_x$ emitted that exceeded the Plant-Wide Annual $NO_x$ Tonnage Limitation |

| | |
|---|---|
| h. Failure to comply with the applicable System-Wide Annual $SO_2$ Tonnage Limitations established by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) at WPS's option, either the Surrender of $SO_2$ Allowances in an amount equal to two times the number of tons of $SO_2$ emitted that exceeded the System-Wide Annual $SO_2$ Tonnage Limitation, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $SO_2$ emitted that exceeded the System-Wide Annual $SO_2$ Tonnage Limitation |
| i. Failure to comply with the applicable Plant-Wide Annual $SO_2$ Tonnage Limitation for established for Pulliam required by this Consent Decree. | (1) $5,000 per ton for the first 100 tons over the limit, and $10,000 per ton for each additional ton over the limit, plus (2) at WPS's option, either the Surrender of $SO_2$ Allowances in an amount equal to two times the number of tons of $SO_2$ emitted that exceeded Plant-Wide Annual $SO_2$ Tonnage Limitation, or the payment of $2,500 per ton for an amount of tons equal to two times the number of tons of $SO_2$ emitted that exceeded the Plant-Wide Annual $SO_2$ Tonnage Limitation |
| j. Failure to comply with any applicable PM Emission Rate, where the violation is less than five percent (5%) in excess of the lb/mmBTU limit | $2,500 per Unit Operating Day per violation, starting on the Unit Operating Day that a stack test result demonstrates a violation and continuing each Unit Operating Day thereafter until and excluding such Unit Operating Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |

39

| | |
|---|---|
| k. Failure to comply with any applicable PM Emission Rate, where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limit | $5,000 per Unit Operating Day per violation, starting on the Unit Operating Day a stack test result demonstrates a violation and continuing each Unit Operating Day thereafter until and excluding such Unit Operating Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
| l. Failure to comply with any applicable PM Emission Rate, where the violation is equal to or greater than 10% in excess of the lb/mmBTU limit | $10,000 per Unit Operating Day per violation, starting on the Unit Operating Day a stack test result demonstrates a violation and continuing each Unit Operating Day thereafter until and excluding such Unit Operating Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
| m. Failure to install, commence Continuous Operation, or Continuously Operate a $NO_x$, $SO_2$ or PM control device as required under this Consent Decree | $10,000 per Day per violation during the first 30 Days; $37,500 per Day per violation thereafter |
| n. Failure to Retire, Refuel or Repower a Unit as required under this Consent Decree | $10,000 per Day per violation during the first 30 Days; $37,500 per Day per violation thereafter |
| o. Failure to conduct a stack test for PM as required by Paragraphs 107 and 108 of this Consent Decree | $5,000 per Day per violation |
| p. Failure to install or operate $NO_x$, $SO_2$, and/or PM CEMS as required in this Consent Decree | $1,000 per Day per violation |
| q. Failure to apply for any permit required by Section XVII (Permits) | $1,000 per Day per violation |
| r. Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 per Day per violation during the first 10 Days; $1,000 per Day per violation thereafter |
| s. Failure to surrender $SO_2$ Allowances as required under this Consent Decree | $37,500 per Day. In addition, $1,000 per $SO_2$ Allowance not surrendered |

Case 1:13-cv-00010-WCG   Filed 05/18/16   Page 43 of 88   Document 20

| | |
|---|---|
| t. Failure to surrender $NO_x$ Allowances as required under this Consent Decree | $37,500 per Day. In addition, $1,000 per $NO_x$ Allowance not surrendered |
| u. Using, selling, banking, trading, or transferring $NO_x$ Allowances or $SO_2$ Allowances except as permitting under this Consent Decree | At WPS's option, either the surrender of Allowances in an amount equal to four times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree, or the payment of $2,500 per ton for an amount of tons equal to four times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree |
| v. Failure to optimize ESPs and Baghouses as required by Paragraph 103. | $1,000 per Day per violation |
| w. Failure to undertake and complete as described in Appendix A any of the Environmental Mitigation Projects in compliance with Section IX (Environmental Mitigation Projects) of this Consent Decree | $1,000 per Day per violation during the first 30 Days; $5,000 per Day per violation thereafter |
| x. Any other violation of this Consent Decree | $1,000 per Day per violation |

140.    Violations of any limit based on a 30-Day rolling average constitutes 30 Days of violation, provided, however, that where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 30 Days, WPS shall not be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

141.    Violations of any limit based on a 12-Month rolling average constitutes 365 Days of violation, provided, however, that where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 12-Months, WPS shall not be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

41

142.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

143.     For purposes of the stipulated penalty Allowance Surrender required pursuant to Subparagraphs 139.f to 139.i, WPS shall make the Surrender of any Allowances required by such Subparagraph by June 30th of the immediately following calendar year.

144.     WPS shall pay all stipulated penalties to the United States within 30 Days of receipt of written demand to WPS from the United States, and shall continue to make such payments every 30 Days thereafter until the violation(s) no longer continues, unless WPS elects within 20 Days of receipt of written demand to WPS from the United States to dispute the imposition or accrual of stipulated penalties in accordance with the provisions in Section XVI (Dispute Resolution) of this Consent Decree.

145.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 142 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.  If the dispute is resolved by agreement, or by a decision of the United States pursuant to Section XVI (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within 30 Days of the effective date of the agreement or of the receipt of the United States' decision;

42

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, WPS shall, within 30 Days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in Subparagraph c, below;

c. If the Court's decision is appealed by either Party, WPS shall, within 15 Days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with interest accrued on such stipulated penalties determined to be owing by the appellate court.

Notwithstanding any other provision of this Consent Decree, the accrued stipulated penalties agreed by the United States and WPS, or determined by the United States through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 139.

146. All monetary stipulated penalties shall be paid in the manner set forth in Section X (Civil Penalty) of this Consent Decree and all Allowance Surrender stipulated penalties shall comply with the Allowance Surrender procedures of Paragraphs 83-84 and 101-102.

147. Should WPS fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

148. The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States by reason of WPS's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty,

WPS shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation.

149. <u>Affirmative defense as to stipulated penalties for excess emissions occurring during Malfunctions</u>:  If any of WPS's Units exceed an applicable 30-Day Rolling Average $NO_x$ Emission Rate or 30-Day Rolling Average $SO_2$ Emission Rate, set forth in this Consent Decree due to Malfunction, WPS, bearing the burden of proof by a preponderance of the evidence, has an affirmative defense to a claim for stipulated penalties under this Consent Decree, if WPS has complied with the reporting requirements of Paragraphs 154 and 155 and has demonstrated all of the following:

    a.  the excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond WPS's control;

    b.  the excess emissions (1) did not stem from any activity or event that could have been foreseen and avoided, or planned for, and (2) could not have been avoided by better operation and maintenance practices in accordance with manufacturers' specifications and good engineering and maintenance practices;

    c.  to the maximum extent practicable, the air pollution control equipment and processes were maintained and operated in a manner consistent with good practice for minimizing emissions in accordance with manufacturers' specifications and good engineering and maintenance practices;

    d.  repairs were made in an expeditious fashion when WPS knew or should have known that an applicable 30-Day Rolling Average $NO_x$ Emission Rate or 30-Day Rolling Average $SO_2$ Emission Rate was being or would be exceeded.  Off-shift labor and

overtime must have been utilized, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

e.  the amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions in accordance with manufacturers' specifications and good engineering and maintenance practices;

f.  all possible steps were taken to minimize the impact of the excess emissions on ambient air quality in accordance with plans and QA/QC protocols approved under this Consent Decree;

g.  all emission monitoring systems were kept in operation if at all possible in accordance with manufacturers' specifications and good engineering and maintenance practices;

h.  WPS's actions in response to the excess emissions were documented by properly signed or otherwise validated, contemporaneous operating logs, or other relevant evidence;

i.  the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance; and

j.  WPS properly and promptly notified EPA as required by this Consent Decree.

150.    To assert an affirmative defense for Malfunction under Paragraph 149, WPS shall submit all data demonstrating the actual emissions for the Day the Malfunction occurs and the 29-Unit Operating Day period following the Day the Malfunction occurs. WPS may, if it elects, submit emissions data for the same 30-Unit Operating Day period but that excludes the excess emissions.

151. <u>Affirmative defense as to stipulated penalties for excess emissions occurring during startup and shutdown</u>: If any of WPS's Units exceed an applicable 30-Day Rolling Average $NO_x$ Emission Rate or 30-Day Rolling Average $SO_2$ Emission Rate set forth in this Consent Decree, due to startup or shutdown, WPS, bearing the burden of proof by a preponderance of the evidence, has an affirmative defense to a claim for stipulated penalties under this Consent Decree, if WPS has complied with the reporting requirements of Paragraphs 154 and 155 and has demonstrated all of the following:

    a. the periods of excess emissions that occurred during startup and shutdown were short and infrequent and could not have been prevented through careful planning and design in accordance with manufacturers' specifications and good engineering and maintenance practices;

    b. the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance or which could have been prevented by following manufacturers' specifications and recommendations and good engineering and maintenance practices;

    c. if the excess emissions were caused by a bypass (an intentional diversion of control equipment), then the bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

    d. at all times, the facility was operated in a manner consistent with good engineering and maintenance practices and manufacturers' specifications and recommendations for minimizing emissions;

46

e. the frequency and duration of operation in startup or shutdown mode was minimized to the maximum extent practicable in accordance with manufacturers' specifications and good engineering and maintenance practices;

f. all possible steps were taken to minimize the impact of the excess emissions on ambient air quality in accordance with manufacturers' specifications and good engineering and maintenance practices;

g. all emissions monitoring systems were kept in operation if at all possible in accordance with manufacturers' specifications and good engineering and maintenance practices;

h. WPS's actions during the period of excess emissions were documented by properly signed or otherwise validated, contemporaneous operating logs, or other relevant evidence; and

i. WPS properly and promptly notified EPA as required by this Consent Decree.

152. To assert an affirmative defense for startup or shutdown under Paragraph 151, WPS shall submit all data demonstrating the actual emissions for the Day the excess emissions from startup or shutdown occurs and the 29-Unit Operating Day period following the Day the excess emissions from startup or shutdown occurs. WPS may, if it elects, submit emissions data for the same 30-Unit Operating Day period but that excludes the excess emissions.

153. If excess emissions occur due to a Malfunction during routine startup and shutdown, then those instances shall be treated as other Malfunctions subject to Paragraph 149.

154. For an affirmative defense under Paragraphs 149 and 151, WPS, bearing the burden of proof by a preponderance of the evidence, shall demonstrate, through submission of the data and information under the reporting provisions of this Section, that all reasonable and

47

practicable measures within WPS's control were implemented to prevent the occurrence of the excess emissions.

155.    WPS shall provide notice to United States in writing of WPS's intent to assert an affirmative defense for Malfunction, startup, or shutdown under Paragraphs 149 and 151 in WPS's semi-annual progress reports as required by Paragraph 133.  This notice shall be submitted pursuant to the provisions of Section XIX (Notices).  The notice shall contain:

   a.  The identity of each stack or other emission point where the excess emissions occurred;

   b.  The magnitude of the excess emissions expressed in lb/mmBTU and the operating data and calculations used in determining the magnitude of the excess emissions;

   c.  The time and duration or expected duration of the excess emissions;

   d.  The identity of the equipment from which the excess emissions emanated;

   e.  The nature and cause of the excess emissions;

   f.  The steps taken, if the excess emissions were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunction;

   g.  The steps that were or are being taken to limit the excess emissions; and

   h.  If applicable, a list of the steps taken to comply with permit conditions governing Unit operation during periods of startup, shutdown, and/or Malfunction.

156.    A Malfunction, startup, or shutdown shall not constitute a Force Majeure Event unless the Malfunction, startup, or shutdown also meets the definition of a Force Majeure Event, as provided in Section XV (Force Majeure).

48

157. The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief.

## XV. <u>FORCE MAJEURE</u>

158. For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of WPS, its contractors, or any entity controlled by WPS that delays or prevents the performance of any obligation under this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite WPS' best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay and/or violation are minimized to the greatest extent possible and the emissions during such event are minimized to the greatest extent possible. Specific references to Force Majeure in other parts of this Consent Decree do not restrict the ability of WPS to assert Force Majeure pursuant to the process described in this Section.

159. <u>Notice of Force Majeure Events</u>. If any event occurs or has occurred that may delay or prevent compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which WPS intends to assert a claim of Force Majeure, the Unit Operator or WPS shall notify the United States in writing as soon as practicable, but in no event later than fourteen (14) Business Days following the date WPS first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation. In this notice, the Unit Operator or WPS shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes

49

of the Force Majeure Event, all measures taken or to be taken by WPS to prevent or minimize the delay or violation, the schedule by which WPS proposes to implement those measures, and the applicable rationale for attributing the failure, delay, or violation to a Force Majeure Event. A copy of this notice shall be sent electronically, as soon as practicable, to the U.S. Department of Justice, EPA, and WDNR. WPS shall adopt all reasonable measures to avoid or minimize such failures, delays, or violations. WPS shall be deemed to know of any circumstance which it, its contractors, or any entity controlled by it, knew or should have known

160. Failure to Give Notice. If WPS fails to comply with the notice requirements of this Section, the United States may void WPS's claim for Force Majeure as to the specific event for which WPS has failed to comply with such notice requirement.

161. United States' Response. The United States shall notify WPS in writing regarding WPS's claim of Force Majeure as soon as reasonably practicable. If the United States agrees that a delay in performance has been or will be caused by a Force Majeure Event, the United States and WPS shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event. In such circumstances, an appropriate modification shall be made pursuant to Section XXIII (Modification) of this Consent Decree.

162. Disagreement. If the United States does not accept WPS's claim of Force Majeure, or if the United States and WPS cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XVI (Dispute Resolution) of this Consent Decree.

163. Burden of Proof. In any dispute regarding Force Majeure, WPS shall bear the burden of proving that any delay in performance or any other violation of any requirement of this

50

Consent Decree was caused by or will be caused by a Force Majeure Event. WPS shall also bear the burden of proving that WPS gave the notice required by this Section and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event. An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

164. <u>Events Excluded</u>. Unanticipated or increased costs or expenses associated with the performance of WPS's obligations under this Consent Decree shall not constitute a Force Majeure Event.

165. <u>Potential Force Majeure Events</u>. The Parties agree that, depending upon the circumstances related to an event and WPS's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; unanticipated coal supply or pollution control reagent delivery interruptions; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization (e.g., the Midwest Independent System Operator), acting under and authorized by applicable law or tariff as accepted by the Federal Energy Regulatory Commission, that directs WPS to supply electricity so long as such order is a response to a state-wide or regional emergency or is necessary to preserve the reliability of the bulk power system. Depending upon the circumstances and WPS's response to such circumstances, failure of a permitting authority or the Public Service Commission of Wisconsin to issue a necessary permit or order with sufficient time for WPS to achieve compliance with this Consent Decree may constitute a Force Majeure Event where the failure of the authority to act is beyond the control of WPS and WPS has taken all steps available to it to

51

obtain the necessary permit or order, including, but not limited to: submitting a complete permit application or request; responding to requests for additional information by the authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the authority.

166.     Extended Schedule.  As part of the resolution of any matter submitted to this Court under Section XVI (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, the United States and WPS by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work and/or obligations under this Consent Decree to account for the delay in the work and/or obligations that occurred as a result of any delay agreed to by the United States or approved by the Court.  WPS shall be liable for stipulated penalties pursuant to Section XIV (Stipulated Penalties) for its failure thereafter to complete the work and/or obligations in accordance with the extended or modified schedule (provided that WPS shall not be precluded from asserting that a further Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule).

## XVI. **DISPUTE RESOLUTION**

167.     The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

168.     The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the

52

Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than 14 Days following receipt of such notice.

169.     Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations between the Parties.  Such period of informal negotiations shall not extend beyond 30 Days from the date of the first meeting between the Parties' representatives unless they agree in writing to shorten or extend this period.

170.     If the Parties are unable to reach agreement during the informal negotiation period, the United States shall provide WPS with a written summary of its position regarding the dispute.  The written position provided by the United States shall be considered binding unless, within 45 Days thereafter, WPS seeks judicial resolution of the dispute by filing a petition with this Court.  The United States may submit a response to the petition within 45 Days of filing.

171.     The time periods set out in this Section may be shortened or lengthened upon motion to the Court of one of the Parties to the dispute, explaining the Party's basis for seeking such a scheduling modification.

172.     This Court shall not draw any inferences nor establish any presumptions adverse to either Party as a result of invocation of this Section or the Parties' inability to reach agreement.

173.     As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.  WPS shall be liable for stipulated penalties pursuant to Section XIV (Stipulated Penalties) for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that WPS shall not be

53

precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

174.    The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their filings with the Court under Paragraph 170, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XVII. PERMITS

175.    Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires WPS to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under State law, WPS shall make such application in a timely manner. Recognizing that the Wisconsin Department of Natural Resources is the SIP-approved permitting authority, EPA will use its best efforts to review expeditiously, to the extent applicable, all permit applications submitted by WPS to meet the requirements of this Consent Decree.

176.    Notwithstanding the previous Paragraph, nothing in this Consent Decree shall be construed to require WPS to apply for, amend, or obtain a PSD or nonattainment NSR permit or permit modification for any physical change in, or change in the method of operation of, any System Unit that would give rise to claims resolved by Section XI (Resolution of Past Civil Claims) of this Consent Decree.

177.    When permits are required, WPS shall complete and submit applications for such permits to the applicable State agency to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the applicable State agency.  Any failure by WPS to submit a timely permit application for a WPS System Unit

54

shall bar any use by WPS of Section XV (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

178.    Notwithstanding the reference to WPS's Title V Permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act and its implementing regulations.  WPS's Title V Permits shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V Permit, subject to the terms of Section XXVII (Conditional Termination of Enforcement Under Decree) of this Consent Decree.

179.    Within 180 Days after the Date of Entry of this Consent Decree, WPS shall amend any applicable Title V Permit application(s), or apply for amendments of its Title V Permits, to include a schedule for all Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to, any (a) 12-Month Rolling Average $SO_2$ Emission Rate, (b) 30-Day Rolling Average $NO_x$ Emission Rate, (c) 30-Day Rolling Average $SO_2$ Emission Rate, (d) Pulliam Plant-Wide Annual $NO_x$ Tonnage Limitation, (e) Pulliam Plant-Wide Annual $SO_2$ Tonnage Limitation, (f) System-Wide Annual $NO_x$ Tonnage Limitation, (g) System-Wide Annual $SO_2$ Tonnage Limitation, (h), the requirements pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, (i) PM Emission Rate and annual stack test requirements, (j) PM CEMS monitoring equipment, and (k) the Retirement, Refueling or Repowering of any Unit as required or elected under this Decree.

180.    Within one year from the Date of Entry of this Consent Decree, WPS shall either apply to permanently include the requirements and limitations enumerated in this Consent

Decree into a federally enforceable permit or request a site-specific amendment to the Wisconsin SIP, such that the requirements and limitations become and remain "applicable requirements" as that term is defined in 40 C.F.R. § 70.2. The permit or Wisconsin SIP amendment shall require compliance with the following: any applicable (a) 12-Month Rolling Average $SO_2$ Emission Rate, (b) 30-Day Rolling Average $NO_x$ Emission Rate, (c) 30-Day Rolling Average $SO_2$ Emission Rate, (d) Plant-Wide Annual $NO_x$ Tonnage Limitation, (e) Plant-Wide Annual $SO_2$ Tonnage Limitation, (f) System-Wide Annual $NO_x$ Tonnage Limitation, (g) System-Wide Annual $SO_2$ Tonnage Limitation, (h) the requirements pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, (i) PM Emission Rate and annual stack test requirements, (j) PM CEMS monitoring equipment, and (k) the Retirement, Refueling or Repowering of any Unit as required or elected under this Decree.

181. WPS shall provide the United States with a copy of each application for a federally enforceable permit or Wisconsin SIP amendment, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.

182. Prior to conditional termination of enforcement through this Consent Decree, WPS shall obtain enforceable provisions in its Title V permits that incorporate all applicable Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to, any applicable (a) 12-Month Rolling Average $SO_2$ Emission Rate, (b) 30-Day Rolling Average $NO_x$ Emission Rate, (c) 30-Day Rolling Average $SO_2$ Emission Rate, (d) Plant-Wide Annual $NO_x$ Tonnage Limitation, (e) Plant-Wide Annual $SO_2$ Tonnage Limitation, (f) System-Wide Annual $NO_x$ Tonnage Limitation, (g) System-Wide Annual $SO_2$ Tonnage Limitation, (h) the

56

requirements pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, (i) PM Emission Rate and annual stack test requirements, (j) PM CEMS monitoring equipment, and (k) the Retirement, Refueling or Repowering of any Unit as required or elected under this Decree.

183.     If WPS proposes to sell or transfer to an entity unrelated to WPS ("Third Party Purchaser") part or all of its Operational or Ownership Interest covered under this Consent Decree, WPS shall comply with the requirements of Section XX (Sales or Transfers of Operational or Ownership Interests) of this Consent Decree with regard to that Operational or Ownership Interest prior to any such sale or transfer.

## XVIII. <u>INFORMATION COLLECTION AND RETENTION</u>

184.     Any authorized representative of the United States, including its attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of a WPS System Unit at any reasonable time for the purpose of:

      a.   monitoring the progress of activities required under this Consent Decree;

      b.   verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

      c.   obtaining samples and, upon request, splits of any samples taken by WPS or its representatives, contractors, or consultants; and

      d.   assessing WPS's compliance with this Consent Decree.

185.     WPS shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in its or its contractors' or agents' possession or control, and that directly relate to WPS's performance of its obligations under this Consent Decree for the following periods: (a) until December 31, 2023 for records concerning physical or operational changes undertaken in

57

accordance with Section V (NO$_x$ Emission Reductions and Controls), Section VI (SO$_2$ Emission Reductions and Controls), and Section VII (PM Emission Reductions and Controls); and (b) until December 31, 2021 for all other records.  This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

186.    All information and documents submitted by WPS pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) WPS claims and substantiates in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

187.    Nothing in this Consent Decree shall limit the authority of EPA to conduct tests and inspections at WPS's facilities under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal laws, regulations, or permits.

## XIX. NOTICES

188.    Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>As to the United States of America:</u>

(if by mail service)
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC  20044-7611
DJ# 90-5-2-1-1230/1

(if by commercial delivery service)
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

58

ENRD Mailroom, Room 2121
601 D Street, NW
Washington, DC 20004
DJ# 90-5-2-1-1230/1

and

(if by mail service)
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Mail Code 2242A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

(if by commercial delivery service)
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios South Building, Room 1119
1200 Pennsylvania Avenue, NW
Washington, DC  20004

and

Director, Air Division
U.S. EPA Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL  60604

and

As to WPS:
Office of Vice President - Environmental
Wisconsin Public Service Corporation
231 W. Michigan St.
Milwaukee, WI 53203

and

Executive Vice President, Corporate Secretary and General Counsel
Wisconsin Public Service Corporation
231 W. Michigan St.
Milwaukee, WI 53203

59

189.    All notifications, communications, or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or overnight delivery service with signature required for delivery, or (b) certified or registered mail, return receipt requested. All notifications, communications, and transmissions (a) sent by overnight, certified, or registered mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service.

190.    Either Party may change either the notice recipient or the address for providing notices to it by serving the other Party with a notice setting forth such new notice recipient or address.

## XX. SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS

191.    If WPS proposes to sell or transfer an Operational or Ownership Interest to another entity (a "Third Party Purchaser"), WPS shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the United States pursuant to Section XIX (Notices) of this Consent Decree at least 60 Days before such proposed sale or transfer.

192.    No sale or transfer of WPS's Operational or Ownership Interest shall take place before the Third Party Purchaser and the United States have executed, and the Court has approved, a modification pursuant to Section XXIII (Modification) of this Consent Decree making the Third Party Purchaser a party to this Consent Decree and jointly and severally liable with WPS for all the requirements of this Consent Decree that may be applicable to the transferred or purchased Operational or Ownership Interests.

193.    This Consent Decree shall not be construed to impede the transfer of any of WPS's Operational or Ownership Interests between WPS and any Third Party Purchaser so long

60

as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation – as between WPS and any Third Party Purchaser of Operational or Ownership Interests – of the burdens of compliance with this Consent Decree, provided that both WPS and such Third Party Purchaser shall remain jointly and severally liable to the United States for the obligations of this Consent Decree applicable to the transferred or purchased Operational or Ownership Interests.

194.    If the United States agrees, the United States, WPS, and the Third Party Purchaser that has become a party to this Consent Decree pursuant to Paragraph 192 may execute a modification that relieves WPS of its liability under this Consent Decree for, and makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Operational or Ownership Interests.  Notwithstanding the foregoing, however, WPS may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Operational or Ownership Interests, including the obligations set forth in Sections IX (Environmental Mitigation Projects) and X (Civil Penalty). WPS may propose and the United States may agree to restrict the scope of the joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Operational or Ownership Interests, to the extent such obligations may be adequately separated in an enforceable manner.

195.    Paragraphs 192 to 194 of this Consent do not apply if an Ownership Interest is sold or transferred solely as collateral security in order to consummate a financing arrangement (not including a sale-leaseback), so long as WPS: (a) remains the owner or operator (as those terms are used and interpreted under the Clean Air Act) of the subject Unit(s); (b) remains

61

subject to and liable for all obligations and liabilities of this Consent Decree; and (c) supplies

EPA with the following certification within thirty (30) Days of the sale or transfer:

<u>"Certification of Change in Ownership Interest Solely for Purpose of Consummating Financing</u>. We, the Chief Executive Officer and General Counsel of WPS, hereby jointly certify under Title 18 U.S.C. Section 1001, on our own behalf and on behalf of WPS, that any change in WPS's Ownership Interest in any Unit that is caused by the sale or transfer as collateral security of such Ownership Interest in such Unit(s) pursuant to the financing agreement consummated on [insert applicable date] between WPS and [insert applicable entity]: a) is made solely for the purpose of providing collateral security in order to consummate a financing arrangement; b) does not impair WPS's ability, legally or otherwise, to comply timely with all terms and provisions of the Consent Decree entered in *United States v. Wisconsin Public Service Corp.,* Civil Action_____; c) does not affect WPS's ownership or operational control of any Unit covered by that Consent Decree in a manner that is inconsistent with WPS's performance of its obligations under the Consent Decree; and d) in no way affects the status of WPS's obligations or liabilities under that Consent Decree."

## XXI. <u>EFFECTIVE DATE</u>

196.    The effective date of this Consent Decree shall be the Date of Entry.

## XXII. <u>RETENTION OF JURISDICTION</u>

197.    The Court shall retain jurisdiction of this case after entry of this Consent Decree

to enforce compliance with the terms and conditions of this Consent Decree and to take any

action necessary or appropriate for the interpretation, construction, execution, or modification of

the Consent Decree, or for adjudication of disputes.  During the term of this Consent Decree,

either Party to this Consent Decree may apply to the Court for any relief necessary to construe or

effectuate this Consent Decree.

## XXIII. <u>MODIFICATION</u>

198.    The terms of this Consent Decree may be modified only by a subsequent written

agreement signed by United States and WPS. Where the modification constitutes a material

change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

# XXIV. GENERAL PROVISIONS

199.    When this Consent Decree specifies that WPS shall achieve and maintain a 30-Day Rolling Average Emission Rate, the Parties expressly recognize that compliance with such 30-Day Rolling Average Emission Rate shall commence immediately upon the date specified and that compliance as of such specified date (e.g., December 30) shall be determined based on data from that date and the 29 prior Unit Operating Days.

200.    When this Consent Decree specifies that WPS shall achieve and maintain a 12-Month Rolling Average Emission Rate, then the Month Containing that Day if that Day is the first Day of the Month, or if that Day is not the first Day of the Month then the next complete Month, shall be the first Month subject to the specified 12-Month limitation. For example, if the specified 12-Month Rolling Average Emission Rate is to be achieved starting January 1, 2013, then January 2013 is the first Month included in the first applicable 12-Month Rolling Average Emission Rate, such that the first complete 12-Month Rolling Average Emission Rate period would include January 2013 through December 2013.

201.    This Consent Decree is not a permit. Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations. The emission rates and removal efficiencies set forth herein do not relieve WPS from any obligation to comply with other state and federal requirements under the Clean Air Act, including WPS's obligation to satisfy any State modeling requirements set forth in the Wisconsin SIP.

202.    This Consent Decree does not apply to any claim(s) of alleged criminal liability.

203.    In any subsequent administrative or judicial action initiated by the United States for injunctive relief or civil penalties relating to Pulliam Units 5, 6, 7, or 8 and Weston Units 1,

63

2, 3, or 4 as covered by this Consent Decree, WPS shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the United States in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to affect the validity of Section XI (Resolution of Past Civil Claims) or in any way compromise or diminish the releases provided by EPA in Section XI (Resolution of Past Civil Claims).

204.    Nothing in this Consent Decree shall relieve WPS from its obligation to comply with all applicable federal, state, and local laws and regulations, including laws, regulations, and compliance deadlines that become applicable after the date of entry of the Consent Decree.  Such laws and regulations include, but are not limited to, the  Cross-State Air Pollution Rule, the Mercury and Air Toxics Standard for Utilities, the Utility NSPS requirements, and the obligation to apply for a Clean Water Act NPDES permit(s) for the discharge of wastewater, and in connection with any such application or application for permit renewal, to provide the NPDES permitting authority with all information necessary to appropriately characterize effluent from their operations and develop appropriate effluent limitations, including but not limited to all information necessary for the NPDES permitting authority to appropriately evaluate discharges of total dissolved solids ("TDS") for their operations. Nothing in this Consent Decree should be construed to provide any relief from the emission limits or deadlines specified in such regulations, including, but not limited to, deadlines for the installation of pollution controls required by any such regulations, nor shall this Decree be construed as a pre-determination of eligibility for the one year extension that may be provided under 42 U.S.C. 7412(i)(3)(B).

64

205.    Subject to the provisions in Section XI (Resolution of Past Civil Claims), Section XVI (Dispute Resolution), and XIV (Stipulated Penalties) nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the United States to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

206.    Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

207.    Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed. For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101. WPS shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits. For example, if an actual Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100. WPS shall report data to the number of significant digits in which the standard or limit is expressed.

208.    This Consent Decree does not limit, enlarge, or affect the rights of any Party to this Consent Decree as against any third parties.

209.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supercedes all prior agreements and understandings among the Parties related to the subject matter herein. No document, representation, inducement, agreement, understanding, or promise

65

constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

210.    Each Party to this action shall bear its own costs and attorneys' fees.

## XXV. SIGNATORIES AND SERVICE

211.    Each undersigned representative of WPS and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

212.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

213.    Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

214.    Unless otherwise ordered by the Court, the United States agrees that WPS will not be required to file any answer or other pleading responsive to the United States' concurrently filed Complaint in this matter until and unless the Court expressly declines to enter this Consent Decree, in which case WPS shall have no less than 30 days after receiving notice of such express declination to file an answer or other pleading in response to the Complaint

## XXVI. PUBLIC COMMENT/AGENCY REVIEW

215.    The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public

66

comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper, or inadequate. WPS shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified WPS, in writing, that the United States no longer supports entry of this Consent Decree.

## XXVII. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT DECREE

216. <u>Termination as to completed tasks.</u> As soon as WPS completes a construction project or any other requirement of this Consent Decree that is not ongoing or recurring, WPS may, by motion to this Court, seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

217. <u>Conditional termination of enforcement through this Consent Decree.</u> Subject to the provisions of Paragraph 218, after WPS:

a. has successfully completed construction, and has maintained operation, of all pollution controls as required by this Consent Decree for a period of two years and has successfully completed all actions necessary to Retire, Refuel or Repower any Unit required or elected to be Retired, Refueled or Repowered as required by this Consent Decree; and

b. has obtained all the final permits and/or site-specific SIP amendments (i) as required by Section XVII (Permits) of this Consent Decree and (ii) that include as federally enforceable permit terms, all Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree;

67

then WPS may so certify these facts to the United States and this Court. If the United States does not object in writing with specific reasons within 45 Days of receipt of WPS's certification, then, for any violations of this Consent Decree that occur after the filing of notice, the United States shall pursue enforcement of the requirements through the applicable permits and/or other enforcement authorities and not through this Consent Decree.

218.    <u>Resort to enforcement under this Consent Decree.</u> Notwithstanding Paragraph 217, if enforcement of a provision in this Consent Decree cannot be pursued by the United States under the applicable permit(s) issued pursuant to the Clean Air Act or its implementing regulations ("CAA Permit"), or if a Consent Decree requirement was intended to be part of a CAA Permit and did not become or remain part of such permit, then such requirement may be enforced under the terms of this Consent Decree at any time.

## XXVIII. <u>FINAL JUDGMENT</u>

219.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the United States and WPS.


        SO ORDERED.

                                        s/ William C. Griesbach
                                        _____
                                        William C. Griesbach, Chief Judge
                                        United States District Court

68

Signature Page for *United States of America v. Wisconsin Public Service Corporation* Consent Decree


FOR THE UNITED STATES DEPARTMENT OF JUSTICE




Respectfully submitted,


  _s/ Ignacia S. Moreno_____
IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources
  Division
United States Department of Justice



  _s/ James A. Lofton_____
JAMES A. LOFTON
Counsel to the Chief
Environmental Enforcement Section
Environment and Natural Resources
  Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-2750



  _s/ Jason A. Dunn_____
JASON A. DUNN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources
  Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1111


(Originally signed copy bearing signatures is filed as ECF No. 10 in Case No. 1:13-cv-00010-WCG; signatures evidencing Consent Decree modifications are filed as ECF Nos. 12 & 17-1. Signature copies are being maintained in the office of attorney for the United States Jason A. Dunn)

69

Signature Page for *United States of America v. Wisconsin Public Service Corporation* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respectfully submitted,

_s/ Susan Shinkman for_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and
    Compliance Assurance
United States Environmental
    Protection Agency

_s/ Phillip A. Brooks_____
PHILLIP A. BROOKS
Director, Air Enforcement Division
United States Environmental
    Protection Agency

_s/ Virginia Sorrell for_____
SABRINA ARGENTIERI
Attorney-Advisor
United States Environmental
    Protection Agency

(Originally signed copy bearing signatures is filed as ECF No. 10 in Case No. 1:13-cv-00010-WCG; signatures evidencing Consent Decree modifications are filed as ECF Nos. 12 & 17-1. Signature copies are being maintained in the office of attorney for the United States Jason A. Dunn)

Signature Page for *United States of America v. Wisconsin Public Service Corporation* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respectfully submitted,

_s/ Susan Hedman_____
SUSAN HEDMAN
Regional Administrator, Region 5
United States Environmental
   Protection Agency

_s/ Robert A. Kaplan_____
ROBERT KAPLAN
Regional Counsel
United States Environmental
   Protection Agency, Region 5

(Originally signed copy bearing signatures is filed as ECF No. 10 in Case No. 1:13-cv-00010-WCG; signatures evidencing Consent Decree modifications are filed as ECF Nos. 12 & 17-1. Signature copies are being maintained in the office of attorney for the United States Jason A. Dunn)

71

Signature Page for *United States of America v. Wisconsin Public Service Corporation* Consent Decree

FOR Wisconsin Public Service Corporation

By:    _/s Lawrence T. Borgard_____

Chairman and Chief Executive Officer

(Originally signed copy bearing signatures is filed as ECF No. 10 in Case No. 1:13-cv-00010-WCG; signatures evidencing Consent Decree modifications are filed as ECF Nos. 12 & 17-1. Signature copies are being maintained in the office of attorney for the United States Jason A. Dunn)

Signature Page for *United States of America v. Wisconsin Public Service Corporation* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE

Respectfully submitted,

  */s James L. Sentelle*_____
JAMES L. SANTELLE
United States Attorney
United States Attorney's Office
517 E. Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-1700

  */s Chris R. Larsen*_____
CHRIS R. LARSEN
Assistant United States Attorney
United States Attorney's Office
517 E. Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-1700

(Originally signed copy bearing signatures is filed as ECF No. 10 in Case No. 1:13-cv-00010-WCG; signatures evidencing Consent Decree modifications are filed as ECF Nos. 12 & 17-1. Signature copies are being maintained in the office of attorney for the United States Jason A. Dunn)

# APPENDIX A

# ENVIRONMENTAL MITIGATION PROJECTS

WPS shall spend at least $6,000,000, and shall comply with the requirements of this Appendix and with Section IX of the Consent Decree (Environmental Mitigation Projects) to implement and secure the environmental benefits of the Environmental Mitigation Projects described below. Nothing in the Consent Decree or this Appendix shall require WPS to spend any more than a total of $6,000,000 on Environmental Mitigation Projects.

## I.  National Park Service and Forest Service Mitigation

A.  <u>National Park Service Mitigation:</u> Within forty-five (45) days from the Date of Entry, WPS shall pay to the National Park Service the sum of $250,000 to be used in accordance with the Park System Resource Protection Act, 16 U.S.C. § 19jj, for the restoration of land, watersheds, vegetation, and forests using techniques designed to improve ecosystem health and mitigate harmful effects from air pollution. The Project(s) shall focus on one or more areas alleged by Plaintiff to have been injured by emissions from WPS System plants, including but not limited to Pictured Rocks National Lakeshore, Sleeping Bear Dunes National Lakeshore, Keweenaw National Historic Park, Apostle Islands National Lakeshore, Mississippi River and Recreation Area, Saint Croix National Scenic Riverway, and Effigy Mounds National Monument.

B.  Payment of the amount specified in the preceding Paragraph shall be made to the Natural Resources Damage and Assessment Fund managed by the United States Department of the Interior. Instructions for transferring funds will be provided to WPS by the National Park Service. Notwithstanding Subsection I.A of this Appendix, payment of funds is not due until ten (10) days after receipt of payment instructions. Upon payment of the required funds into the Natural Resource Damage and Assessment Fund, WPS shall have no further responsibilities regarding the implementation of any project selected by the National Park Service in connection with this provision.

C.  <u>United States Forest Service Mitigation:</u> Within forty-five (45) days from the Date of Entry, WPS shall pay to the United States Forest Service the sum of $250,000 to be used in accordance with 16 U.S.C. § 579c, for the improvement, protection, or rehabilitation of lands under the administration of the Forest Service. The Project(s) shall focus on one or more areas alleged by Plaintiff to have been injured by emissions from WPS System plants, including but not limited to the Chequamegon-Nicolet National Forest and the Manistee National Forest.

D.  Payment of the amount specified in the preceding Paragraph shall be made to the Forest Service pursuant to payment instructions provided to WPS. Notwithstanding Subsection I.C of this Appendix, payment of funds by WPS is not due until ten (10) days after receipt of payment instructions. Upon payment of the required funds, WPS shall have no

1

further responsibilities regarding the implementation of any project selected by the Forest Service in connection with this provision.

## II. Overall Schedule and Budget for Remaining Environmental Mitigation Projects

A. Within 120 Days of the Date of Entry, unless otherwise specified by this Appendix, WPS shall submit proposed plans to EPA for review and approval pursuant to Section XIII of the Consent Decree (Review and Approval of Submittals) for spending $5,500,000 in Project Dollars for the Projects listed in Sections III through VII over a period of not more than 5 years from the date of plan approval, and in accordance with the deadlines established in this Appendix. EPA reserves the right to disapprove any of the plans should the Agency determine based on an analysis of the plans submitted by WPS and all the potential environmental impacts that the Project is not environmentally beneficial. WPS shall perform the Projects listed in Sections III through V, and may perform the Projects listed in Sections VI and VII.

B. WPS may, at its election, consolidate the Project plans required by this Appendix into one or more Project plans.

C. Unless otherwise specified by this Appendix, WPS may, at its election, spread its payments for Environmental Mitigation Projects over the five-year period commencing upon the date of plan approval. WPS may also accelerate its payments to better effectuate a proposed mitigation plan, but WPS shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures.

D. All proposed Project plans shall include the following:

1. A plan for implementing the Project.
2. A summary-level budget for the Project.
3. A time line for implementation of the Project.
4. A description of the anticipated environmental benefits of the Project including an estimate of emission reductions (e.g., SO2, NOx, PM, mercury, CO2) expected to be realized.

E. Upon approval by EPA of the plan(s) required by this Appendix, WPS shall complete the approved Projects according to the approved plan(s). Nothing in this Consent Decree shall be interpreted to prohibit WPS from completing the Projects ahead of schedule.

F. Commencing with its first progress report due pursuant to Section XII (Periodic Reporting) of the Consent Decree, and continuing biannually thereafter until completion of the Projects, WPS will include in the progress report information describing the progress of each Project and the Project Dollars expended on each Project to date.

G. In accordance with the requirements of Paragraph 116 of the Consent Decree, within sixty (60) days following the completion of each Project, WPS shall submit to the United States for approval of Project closure, a Project completion report that documents:

2

1. The date the Project was completed;

2. The results and documentation of implementation of the Project, including the estimated emission reductions or other environmental benefits achieved;

3. The Project Dollars incurred by WPS in implementing the Project; and

4. Certification by an authorized representative in accordance with Paragraph 136 of the Consent Decree that the Project has been completed in full satisfaction of the requirements of the Consent Decree and this Appendix.

H. If EPA concludes based on the Project completion report or subsequent information provided by WPS that a Project has been performed and completed in accordance with the Consent Decree, then EPA will approve completion of the Project for purposes of the Consent Decree.

## III. Community Manure Digester

A. Consistent with the requirements of Section II of this Appendix, WPS shall propose a plan to spend up to $300,000 to fund a project to reduce pollutants through conversion of food and/or animal waste to biogas or electricity within WPS's service territory. These Project Dollars will act as seed funding for the entire Project, which is expected to cost significantly more and which may include the construction of community manure treatment facilities designed to receive manures from nearby dairy farms. Such a project will promote solutions to the continuing water quality issues posed by phosphorus and nutrient-containing runoff and generate a biogas that would be used to generate renewable electricity for offsite or facility use.

B. In undertaking this Project, WPS may partner with governmental and other third party organizations in Wisconsin. Locations would be sought to maximize the "brown power" generation displaced and the nutrient loading reduced in the host watershed.

C. WPS shall spend a maximum of $300,000 in Project Dollars to implement the Digester Project. In addition to the requirements of Section II of this Appendix, the plan required to be submitted pursuant to this Appendix shall also satisfy the following criteria:

1. Describe how the proposed Project is consistent with the requirements of this Section and the Consent Decree, and how the Projects will actually result in the emission reductions projected to be reduced pursuant to this Section.

2. Describe the governmental and other third party organizations involved in the implementation of the Project.

D. Performance: Upon approval of the Digester Plan by EPA, WPS shall complete the Project according to the approved plan and schedule.

3

## IV. Renewable Energy Resource Enhancements

A. <u>Wind Boost</u>. Consistent with the requirements of Section II of this Appendix, WPS shall propose a plan to spend up to $2,000,000 in Project Dollars on projects designed to increase the power production potential of the Crane Creek wind farm or existing wind farms in Wisconsin. As required by Paragraph 124 of the Consent Decree, such projects shall be in addition to any other legal obligations, including WPS's obligations under any state Renewable Portfolio Standard. Prior to implementation of the project, WPS shall complete a study of equipment, historic production, and wind conditions to customize optimizations and maximize production from individual turbines and from the wind site as a whole. The potential improvements might include a control system upgrade, blade tip extensions, winter icing prevention, turbine pitch optimization, and turbine control software. The intent of the projects would be to increase the generation from the renewable resource wind generation facility. This would be in excess of WPS's obligations under the state's Renewable Portfolio Standard, producing additional MW generation from renewable wind power, which is expected to offset coal generation.

B. WPS shall spend a maximum of $2,000,000 in Project Dollars to implement the Wind Boost Project. For purposes of calculating the Project Dollars to be used for the Wind Boost Project, Project Dollar credit given for the Project shall reflect the net between WPS's cost in implementing the Project (less project studies and feasibility analyses), and the economic benefit or income resulting from the Project. WPS shall receive Project Dollar Credit for expenditures only to the extent WPS does not receive an offsetting financial or economic benefit from such expenditures; in determining how many Project dollars have been spent by WPS, WPS shall debit any such offsetting financial or economic benefit received against WPS's expenditures for the Project. WPS shall not be given Project Dollar Credit for any cost associated with studies and/or feasibility analyses and shall only include those construction activities and improvements that generate actual additional energy output. Any additional Renewable Energy Credits (RECs) generated from such projects shall not be available for sale or use toward any State Renewable Portfolio Standard obligation.

C. <u>Performance</u>: Upon approval of the Wind Boost Project Plan by EPA, WPS shall complete the Project according to the approved plans and schedules.

## V. Wood Stove Change out Project

A. Consistent with the requirements of Section II of this Appendix, WPS shall propose a plan to spend no less than $750,000, and up to $2,600,000, Project Dollars to sponsor a wood-burning appliance change out and retrofit project ("Wood Stove Project") that shall be implemented by one or more state, local or tribal air pollution control agencies, or by one or more third-party non-profit organizations or entities, in areas that would benefit from reductions of fine particle pollution and hazardous air pollutants. The air pollutant reductions shall be obtained by replacing, retrofitting or upgrading inefficient, higher polluting wood-burning stoves and outdoor boilers as follows: (1) replacing older

4

hydronic or outdoor wood boilers with EPA certified hydronic heaters; (2) replacing pre-1988 wood stoves with EPA-certified wood stoves and/or cleaner burning, more energy-efficient hearth appliances (e.g., wood pellet, gas, or propane hearth appliances); and/or (3) replacing spent catalysts in EPA-certified wood stoves. To qualify for replacement, retrofitting or upgrading, the older appliance must be the primary source of residential heat.

B.  WPS shall complete the Wood Stove Project by December 31, 2017, except that WPS may request an extension of time to complete the project if it appears likely that all Project Dollars designated under the Plan will not be spent within such period despite WPS's best efforts to implement the Wood Stove Project.

C.  WPS shall sponsor the implementation of the Wood Stove Project in Brown, Marathon, and adjacent counties in Wisconsin. In determining the specific areas to implement this project within the aforementioned geographic areas, WPS shall give priority to: (1) areas with high amounts of air pollution, especially particle pollution and hazardous air pollutants; (2) areas located within a geography and topography that make them susceptible to high levels of particle pollution; (3) areas that have a significant number of older hydronic or outdoor wood boilers and pre-1988 wood stoves; and (4) areas with dense residential populations.

D.  WPS and the air pollution control agency(ies) or non-profit organization(s) that will implement the Wood Stove Project shall consult with EPA's Residential Wood Smoke Reduction Team and shall implement the Wood Stove Project consistent with the materials available on EPA's Burn Wise website at http://www.epa.gov/burnwise.

E.  WPS shall limit the use of Project Dollars for administrative costs associated with implementation of the Wood Stove Project to no greater than 10% of the Project Dollars that WPS provides to a specific air pollution control agency or non-profit organization.

F.  The Wood Stove Project shall provide incentives for the wood stove and wood boiler replacements, retrofits and upgrades described above in this Section through rebates, vouchers and/or discounts. The Wood Stove Project shall provide for the issuance of rebates, vouchers and/or discounts to residential homeowners in amounts ranging from $3,000 to $4,000 for each EPA certified hydronic heater, or $1,000 to $1,500 for each replacement wood stove. The Wood Stove Project may also provide rebates or vouchers for the full cost of replacing older hydronic or outdoor wood boilers and pre-1988 wood stoves for income-qualified residential homeowners, if such full cost rebates or vouchers are included and approved in the Plan in accordance with the requirements of Subsection H.5 below.

G.  The Wood Stove Project shall provide educational information and outreach regarding the energy efficiency, health and safety benefits of cleaner-burning alternatives to older hydronic or outdoor wood boilers and pre-1988 wood stoves, and the proper operation of wood-burning stoves and hearth appliances.

5

H. In addition to the requirements of Section II, the Wood Stove Project plan proposed by WPS shall:

1. Identify the air pollution control agency(ies) or non-profit organization(s) that have agreed to implement the WSC Project.

2. Describe the schedule and the budgetary increments in which WPS shall provide the necessary funding to the air pollution control agency(ies) or non-profit organization(s) to implement the Wood Stove Project.

3. Describe all of the elements of the Wood Stove Project that the air pollution control agency(ies) and/or non-profit(s) will implement.

4. Include measures to ensure that the air pollution control agency(ies), or non-profit organization(s), that are acting on WPS's behalf shall implement the Wood Stove Project in accordance with the requirements of this Appendix, and that the Project Dollars will be used to support the actual replacement, retrofitting, and/or upgrading of wood-burning stoves and boilers currently used as the primary source of residential heat.

5. If the plan proposes to provide rebates or vouchers for the full cost of replacing older hydronic or outdoor wood boilers and pre-1988 wood stoves for income-qualified residential homeowners, describe and estimate the number of energy efficient appliances it intends to make available, the cost per unit, and the criteria the air pollution control agency(ies) or nonprofit organization(s) will use to determine which residential homeowners should be eligible for such full cost replacement.

6. If applicable, identify any organizations or entities with which the air pollution control agency(ies) or non-profit organization(s) will partner to implement the Wood Stove Project, including wood-burning appliance trade associations, national or local health organizations, facilities that will dispose of old stoves so that they cannot be resold or reused, individual wood stove retailers, propane dealers, housing assistance agencies, local fire departments, and local green energy organizations.

7. Describe how the air pollution control agency(ies) or non-profit organization(s) will ensure that the inefficient, higher polluting wood-burning stoves and outdoor boilers that are replaced under the Wood Stove Project will be properly recycled or disposed.

8. Describe how the air pollution control agency(ies) or non-profit organization(s) will conduct outreach in the Wisconsin counties within the geographic area of the Wood Stove Project.

I. <u>Performance</u>: Upon approval of the Wood Stove Project Plan by EPA, WPS shall complete the Project according to the approved plan and schedule. Should WPS, despite its best efforts to fund the Project Dollars at the levels required by and in compliance with

6

this Section, be unable to spend at least $750,000 on this Project, WPS may request EPA's approval to allocate such Project Dollars towards another of the Projects specified in this Appendix.

## ADDITIONAL MITIGATION PROJECTS

**VI.** **Compressed Natural Gas (CNG) or Hybrid Fleet Project**

A. Consistent with the requirements of Section II of this Appendix, WPS may propose a plan to spend up to $2,000,000 Project Dollars to replace gasoline and diesel powered fleet vehicles located in WPS's service territory (passenger cars, light trucks, and heavy duty service vehicles) with newly manufactured Alternative Fuels Vehicles (as defined below) and/or Compressed Natural Gas (CNG) Vehicles. Upgraded fleet vehicles shall be owned by WPS or shall be publicly-owned motor vehicles. The replacement of gasoline and diesel vehicles with Alternative Fuels Vehicles or CNG Vehicles will reduce emissions of NOx, PM, VOCs, and other air pollutants. Any Alternative Fuel Vehicle or CNG Vehicle shall meet all applicable engine standards, certifications, and/or verifications required by law.

B. Definitions for Plan:

1. "Alternative Fuels Vehicle" means a Hybrid Vehicle, Plug in Hybrid vehicle, or Electric Vehicle.
2. "Hybrid Vehicle" means a vehicle that can generate, store, and utilize electric power to reduce the vehicle's consumption of fossil fuel.
3. "Plug in Hybrid" means a vehicle that can be charged from an external source and can generate, store, and utilize electric power to reduce the vehicle's consumption of fossil fuel. These vehicles typically include a larger battery pack to allow an extended range of operation without the use of the gasoline or diesel engine.
4. "Electric Vehicle" means a vehicle that does not utilize an internal combustion engine and instead relies entirely on battery power for propulsion.

C. In addition to the requirements of Section II, the plan will also satisfy the following criteria:

1. Ensure that all vehicles proposed for inclusion in this program will be regular production models that meet all applicable engine standards, certifications or verifications;
2. Include a schedule and budget for completing the fleet replacement program;
3. Describe the process and criteria WPS will use to select any fleet operators and owners in WPS's service territory that their fleet of vehicles may be eligible to participate in the fleet replacement program and to solicit their interest in participating in the program.
4. Describe the process and criteria WPS will use to select any fleet operators and owners to participate in the program, consistent with the requirements of this Section.

7

5. Prioritize the public fleets in WPS's service territory that will be selected for participation in this Project, including consideration of such issues as environmental justice and air quality.
6. Describe the rationale and basis (including a discussion of cost) for selecting the make and model of the Alternative Fuel Vehicle or CNG Vehicle chosen for this Project, including information about other available vehicles and why such vehicles were not selected.
7. Describe the final disposition of the vehicles that are being replaced.
8. Propose a method to account for the amount of Project Dollars that will be credited for each replaced vehicle, taking into account the incremental costs of program vehicles compared to similar conventional vehicles and potential savings associated with the replacement;
9. Provide a method of determining net present value of the savings of program vehicles as compared to similar conventional vehicles;
10. Certify that the program vehicles will be retained and operated for their useful life;
11. Prioritize the replacement of diesel-powered vehicles to the greatest extent practical and available; and
12. Identify any person or entity, other than WPS, that will be involved in the Project. This does not include vehicle manufacturers or dealers who would provide vehicles but does include any proposed third party who would have a coordination or project management role in the fleet replacement program.

D. With respect to costs associated with vehicles, WPS shall only receive credit toward Project Dollars for the incremental cost of Alternative Fuels Vehicles or CNG Vehicles as compared to the cost of a newly manufactured, similar motor vehicle powered by conventional diesel or gasoline engines. WPS shall also receive credit toward Project Dollars for costs associated with infrastructure needed to support such Project.

## VII. Solar/Thermal Technologies Project

A. Consistent with the requirements of Section II of this Appendix, WPS may propose a plan to spend up to $2,000,000 Project Dollars to install conventional flat panel or thin film solar photovoltaics ("PV Project"), and/or solar thermal water ("Thermal Project") at a state or local government-owned building, and/or buildings owned by nonprofit groups, in Brown, Marathon, and adjacent counties in Wisconsin. WPS shall implement the PV and/or Thermal Project(s) as described below.

B. PV Project: A PV Project shall, at a minimum, consist of: (1) the installation of solar panels at a single location with unrestricted solar access, producing at least 10 kilowatts direct current, but not to exceed the total annual electricity baseload of the building the project serves; (2) a grid-tied inverter, appropriately sized for the capacity of the solar panels installed at the location; (3) the appropriate solar panel mounting equipment for the type of roof or project site location at the particular school, government-owned building, or building owned by nonprofit groups selected, i.e., roof mount or ground mount; (4) wiring, conduit, and associated switchgear and metering equipment required

8

for interconnecting the solar generator to the utility grid; and (5) appropriate monitoring equipment supported by kiosk-delivered educational software to enable the school students and/or staff to monitor the total and hourly energy output of the system (kilowatt hours), environmental benefits delivered (pounds $CO_2$ avoided), hourly ambient temperature and cell temperature (C°), irradiance (W/M2), as well as time sensitive voltage, power and current metrics. The PV Project shall be installed on the customer side of the meter and ownership of the system shall be conveyed to the building owner at the site. All related environmental benefits shall be retained by the system owner, including associated renewable energy certificates. WPS shall include in its bid proposals the requirement that the major subcomponents of the PV System include manufacturer parts warranties (e.g. PV modules, inverter) and a Project Service Contract, as described in Subsection VII.E, below. The service and maintenance contract/warranty will be delivered through a third-party provider (system integrator or service provider) but be administered by the project host by way of payment through the escrow account specified in Subsection VII.E below. WPS shall use North American Board of Certified Energy Practitioners (NACEP) certified energy professionals to perform the design and installation of the PV Project to ensure the highest quality installation and performance of the system.

C. <u>Thermal Project:</u> A Thermal Project shall, at a minimum, consist of: (1) the proper installation of solar thermal technologies at a single location with unobstructed solar access, using active direct or indirect systems with OG-100 or OG-300 certification from the Solar Rating and Certification Corporation; (2) use of industry best practices in sizing the solar thermal collectors' surface area to match the intended storage tank and end use application; (3) appropriate monitoring equipment supported by kiosk-delivered educational software to enable the school students and/or staff to monitor the total and hourly thermal energy output of the system, operating parameters, and environmental benefits delivered; and (4) installed systems should provide adequate and redundant freeze protection appropriate for the system's climate region. The Thermal Project shall be installed on the customer side of the meter and ownership of the system shall be conveyed to the building owner at the site. All related environmental benefits shall be retained by the system owner, including associated renewable energy certificates or carbon offsets. WPS shall include in its bid proposals the requirement that each Thermal System include a manufacturer parts warranty and a Project Service Contract, as described in Subsection VII.E below. The service and maintenance contract/warranty will be delivered by WPS or through a third-party provider (system integrator or service provider) but be administered by the project host by way of payment through the escrow account specified in Subsection VII.E below. WPS shall use NABCEP-certified energy professionals to perform the design and installation of the Thermal Project to ensure the highest quality installation and performance of the system.

D. Warranty/Service Contract: The plan for any PV and/or Thermal Project shall also include the requirement for (1) a manufacturer parts warranty for the solar panels installed for 25 years and invertors installed for 10 years; and (2) a service contract ("Project Service Contract") for maintenance of the Project for twenty-five (25) years from the date of installation, including but not limited to annual system checkups and

9

solar module cleaning, and normal Project component replacements, including installation of new system components as needed to extend the life of the Project through the termination of the contract term.

E.   WPS shall purchase the Project Service Contract for the benefit of the entity that owns the building where the Project is installed (Service Contract Beneficiary) and shall fund the cost of the Project Service Contract by depositing funds in an escrow account for use by such Service Contract Beneficiary solely for purposes of maintaining the system for the life of the Project.

F.   In addition to the requirements of Section II, the proposed Project(s) plan shall also satisfy the following criteria:

1.   Include a schedule and budget for completing each portion of the PV or Thermal Project(s).

2.   Provide a detailed accounting supporting the costs and activities associated with the Project Service Contract, and, if using an escrow account to fund the Project Service Contract, the schedule and monetary installments for deposits to such account to support the operation and maintenance activities over the life of the system and a demonstration that such escrow account includes appropriate restrictions on the Service Contract Beneficiary's use of such funds, solely for purposes of maintaining the Project.

3.   Describe the process WPS will use to notify the potential recipients described in Subsection VII. A above that they are eligible to participate in this Project and to solicit their interest in participating.

4.   Describe the process and criteria that WPS will use to select the final recipients for the PV or Thermal Project(s), including baseload electricity usage, thermal load, solar access availability, low income neighborhood schools and other relevant criteria.

5.   Identify any person or entity other than WPS that will be involved in the PV or Thermal Project and describe the third-party's role in the PV or Thermal Project, the basis for asserting that such entity is able and suited to perform the intended role, and the competitive bidding process used to solicit third-party interest. Any proposed third-party must be legally authorized to perform the proposed role and to receive Project Dollars.

G.   In addition to the information required by Subsection II.F above, WPS's final report for the Project(s) shall also identify the government/nonprofit owned buildings where the PV and/or Thermal Project(s) were installed, the size of the system(s), the components installed, the total cost(s) and expected energy output and environmental benefits, and any lessons learned.

**VIII.** **Land Acquisition and Restoration Project**

A. Consistent with the requirements of Section II of this Appendix, WPS may submit a plan to EPA for review and approval for the use of up to $2,000,000 in Project Dollars for acquisition and restoration of ecologically significant lands, watersheds, vegetation, and/or forests that are part of, adjacent to, or near the Barkhausen Water Fowl Preserve in Brown County, Wisconsin. ("Land Acquisition and Restoration Project").

B. The goal of the Land Acquisition and Restoration Project is the protection through acquisition and/or restoration of ecologically significant lands, watersheds, vegetation, and/or forests using adaptive management techniques designed to improve ecosystem health and mitigate harmful effects from air pollution. In addition, the funding shall be used to provide for public use of acquired areas in a manner consistent with the ecology of the area.

C. For purposes of this Appendix and Section IX of this Consent Decree (Environmental Mitigation Projects), land acquisition means purchase (on behalf of the Defendant or a third-party) of interests in land, including fee ownership, easements, or other restrictions that run with the land that provide for the perpetual protection of the acquired land. Restoration may include, but is not limited to, reforestation or revegetation (using plants native to the area) and/or removal of non-native, invasive plant species. Any restoration action must incorporate the acquisition of an interest in the restored lands sufficient to ensure perpetual protection of the restored land.

D. In addition to the requirements of Section II of this Appendix, the proposed Land Acquisition and Restoration Project plan shall also satisfy the following criteria:

   1. Describe generally the areas proposed to be acquired or restored, including a map clearly identifying the location of the land relative to the Units addressed in this Consent Decree and all city, state, or federal publicly protected lands/parks in the area surrounding the proposed land to be acquired/restored.

   2. Provide a justification of why the area should be considered ecologically and/or environmentally significant and warrants preservation and/or restoration.

   3. Provide the projected cost of the project and a schedule for completing and funding each portion of the project.

   4. Identify any person or entity(s) other than WPS that will be involved in the project, including all owners with interests in the land. WPS shall describe all third-party roles in the action and the basis for asserting that such entity is able and suited to perform the intended role. Any proposed third-party must be legally authorized to perform the proposed action and to receive Project Dollars.

E. Upon EPA's approval of the Land Acquisition and Restoration Project plan, WPS may transfer up to $2,000,000 of Project Dollars to one or more land acquisition funds,

11

provided that the use of such funds by the recipient is conditioned to use for partial or full implementation of the land acquisition and restoration described in the Land Acquisition and Restoration Project plan. If WPS elects to transfer funds as described in this Paragraph, all Project Dollars shall be transferred within 2 years of the Date of Entry of the Modification Order.

F.   In addition to the information required to be included in the report pursuant to Section II.G of this Appendix, WPS shall include in that report any reports related to this Land Acquisition and Restoration Project that any applicable third-party fund or organization provided to WPS.

G.   All Land Acquisition and Restoration Project lands shall be acquired within 5 years of plan approval. If all Land Acquisition and Restoration Project lands are acquired earlier than 5 years after plan approval, WPS shall have no further responsibilities regarding the implementation of the Land Acquisition and Restoration Project upon EPA approval of the report described in Section II.G of this Appendix.

12